IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 25, 2011 Session

# IN THE MATTER OF: MELANIE T. ET AL.

**Appeal from the Circuit Court for Coffee County**
**No. 125J      Vanessa Jackson, Judge**

**No. M2010-01436-COA-R3-JV - Filed April 15, 2011**

This dependent and neglected action involves the defendant's minor biological child and two minor stepchildren. The defendant appeals the finding by the circuit court that he severely abused his two stepchildren. He contends that DCS failed to state a claim against him upon which relief could be granted because he is not the biological or legal father of the children. He also contends the evidence is insufficient to find that he committed severe child abuse. We have determined the petition states a claim against the defendant, and that the evidence clearly and convincingly supports the findings that all three children are dependent and neglected, and that the defendant severely abused the two stepchildren children. Thus, we affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

C. Brent Keeton, Manchester, Tennessee, for the appellant, Jason R.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

The defendant in this action is the husband of the mother of four minor children, Anthony, Melanie, Bailey and Miles.[1] This petition concerns only the three youngest children, Melanie, Bailey and Miles; Anthony is not involved. Of Mother's four children, only Miles is the defendant's biological child. The two middle children, Melanie and Bailey,

---

[1]The mother was also a defendant at the trial level, but did not file an appeal.

are from a previous relationship and Mr. R is not their biological or legal father.

The children's mother ("Mrs. R." or "Mother") first met the defendant, Jason R. ("Mr. R.") in the spring of 2005. At that time, Mother lived in an apartment with her mother, Melanie and Bailey; Mr. R. lived in a separate apartment in the same apartment complex. Miles was born in January 2006, when Melanie was five years old and her sister, Bailey, was two years old. Although Mr. R still maintained his separate apartment, Mrs. R. and Mr. R. began living together in February 2006 and were married one year later.

The relationship was rife with domestic violence, anger and fear. Mr. R. often disciplined the children violently: he struck them with his belt, picked them up by their heads, slammed them into walls, yelled in their faces, cursed at them, and fought with Mrs. R. in their presence. In one particular incident, Mr. R. slammed Mother against a wall while she was holding Bailey in her arms. Bailey sustained a fractured leg. She had to be taken to the emergency room, where her leg was placed in a splint. Mr. and Mrs. R. reconciled shortly thereafter.

Although there was a short lull following the emergency room visit, the physical and emotional abuse of the children and Mrs. R. soon resumed. In May 2007, during an argument with Mrs. R., Mr. R. grabbed the side of a stroller that Anthony, Melanie and Bailey were riding in, causing it to buckle and the children to fall. Following this incident, Mrs. R. called the police and sought an order of protection. Mr. R. then began staying at his separate apartment. However, at Mrs. R.'s request, the order of protection was voluntarily dismissed in July 2007 and Mr. and Mrs. R. began living together again that same month.

Several incidents took place in Fall 2007 that culminated in the filing of the petition that is the subject of this appeal as well as a second order of protection against Mr. R. First, Melanie's special education teacher, Mary Camp, noticed that Melanie was more agitated than usual one morning, and discovered a large bump on Melanie's forehead. Melanie informed Ms. Camp that Mr. R. had gotten mad at her and thrown her against a wall, causing her to hit her head. The school nurse reported this incident to the Department of Children's Services ("DCS"). Second, Melanie told Mother for the first time that Mr. R. had held her down, touched her and put his mouth on her vagina and breasts.[2] Melanie was also

---

[2]Both Melanie and Bailey gave numerous and graphic reports of other very serious assaults and sexual abuse by Mr. R.; however, it is unnecessary that we state all of the children's statements of abuse. This is because the issue is not how often the children were abused or whether their allegations constitute severe abuse; rather the issue is whether their statements and the testimony and proof presented at trial are sufficient to establish that Mr. R. severely abused Melanie and Bailey. We will therefore focus on those statements that identified Mr. R. as the perpetrator but omit the more graphic substance of those statements.

hospitalized at Vanderbilt Children's Hospital from October 24 to November 9, 2007 for exhibiting dangerous behaviors.

Problems with Mr. R. and Bailey, then two years old, also began to escalate. Mother informed police in September 2007 that during dinner one night, Mr. R. forced Bailey to eat food off the kitchen floor after Bailey dropped it from the table. Additionally, about one week after Melanie reported Mr. R.'s sexual abuse to Mother, Bailey also told Mother that her and Mr. R. played "kitty games." Both girls used the term "kitty" to refer to their vaginas.

All three children were also exposed to incidents of domestic violence between Mr. R. and Mother. As frequently as three to four times a week, Mother and Mr. R. got into heated arguments that escalated into physical violence in the home while the children were present.

Other adults in the children's lives also became aware of the family situation beginning in Fall 2007. Melanie had been receiving counseling at Centerstone, a community-based behavioral healthcare provider, since March 2004, and had been diagnosed and treated for attention deficit hyperactivity disorder (ADHD), a phonological disorder, and a mood disorder. In May 2007, she began seeing Daniel F. Mansfield, a family therapist and the clinic manager at Centerstone.[3] During her treatment with Mr. Mansfield, Melanie disclosed several instances of sexual and physical abuse. Melanie underwent more psychiatric testing, and Mr. Mansfield soon diagnosed Melanie with post-traumatic stress disorder (PTSD). At this time, in addition to Mr. Mansfield, Melanie was seeing Lynnette Dimick, an intensive in-home counselor. In October 2007, Mother relayed Melanie's allegations of abuse by Mr. R. during one of Ms. Dimick's home visits. Ms. Dimick promptly contacted the police as well as Richard Ferencei, an investigator with the Department of Children's Services ("DCS"), who began investigating the allegations of abuse.

As a result of its investigation, DCS filed a petition to declare all three children dependent and neglected on October 31, 2007. The petition named Mr. and Mrs. R. as defendants and alleged that "the children are subject to physical abuse, sexual abuse, exposure to domestic violence, and neglect." All three children were immediately removed from the home of Mr. and Mrs. R. and placed in foster care; Melanie was six years old, Bailey was three, and Miles was twenty-two months. Bailey and Miles were placed together with Carmen Breedlove, and Melanie was separately placed with Joyce Hodges.

After being removed from Mr. and Mrs. R.'s home, Melanie also independently disclosed the abuse to her foster parent, Ms. Hodges. Ms. Hodges testified that Melanie told

---

[3]Mr. Mansfield also worked with Bailey, beginning in December 2007, and Miles beginning in 2009.

her about, "one time in particular [Mr. R.] was on the bed, and her mother was on the bed, and [Mr. R.] put his thingy with the hair all around it in her, in her body. . . . Her mother told her . . . she was doing the right thing, it was okay." In addition to Melanie's actual disclosures, Ms. Hodges also noticed that Melanie would cry and hide in the back of her closet any time she heard the doorbell ring, fearing Mr. R. was at the door. She also described how, whenever she was driving with Melanie and they passed Mr. R.'s workplace, Melanie would start screaming and "going crazy" in the backseat of Ms. Hodges' car. During a trip with Ms. Hodges to Chattanooga in February 2008, Melanie informed several strangers of her abuse before Ms. Hodges could stop her, telling them that "[Mr. R's] thing felt like needles; it hurt so bad."

Melanie continued to get treatment at Centerstone when she was in foster care. During an appointment in December 2008, Melanie drew several pictures of her vagina bleeding and a person, whom she identified as Mr. R., poking sharp things into her. She drew sad faces to represent herself in the pictures. Melanie also experienced fairly frequent incidents of enuresis and encopresis.[4]

Bailey, Melanie's younger sister, began treatment at Centerstone in December 2007, after she was placed in foster care. She too was experiencing incidents of encopresis and enuresis, and was also diagnosed with PTSD. During Bailey's treatment with Mr. Mansfield, she disclosed sexual abuse perpetrated by Mr. R. For example, in a meeting on February 21, 2008, Bailey stated that "[Mr. R.] touched my kitty." On April 17, 2008, she used puppets to explain what had occurred, and stated that "[Mr. R.] touched me here and here," pointing to her genitals and bottom. When asked where Mrs. R. was during this time, Bailey also disclosed to Mr. Mansfield that "mom watched when [Mr. R.] touched me." On May 12, 2008, Bailey informed her intensive home counselor, Joe Harrison, that Mr. R. had bitten her left nipple, and she asked Mr. Harrison if that was also a private part.

In the interim, on April 17, 2008, DCS filed a motion to amend its petition to assert the new facts that had been revealed since the children were in foster care, and to add claims of "severe abuse" against both Mr. and Mrs. R. The motion was granted and an amended petition was filed.

The case went to trial in the Juvenile Court of Coffee County on May 18, 2009. Following the hearing, the juvenile court declared the children dependent and neglected; however, it found there was not clear and convincing evidence that Mr. R. had severely

---

[4]Mr. Mansfield testified that, "Enuresis has to do with bedwetting or urinating inappropriately after being appropriately toilet trained, and then encopresis has to do with the same elimination matter but regarding defecation."

abused Melanie and Bailey. DCS appealed this ruling to the Circuit Court of Coffee County. All three children remained in the custody of DCS and in foster care while the appeal was pending.

The de novo appeal was heard in the Circuit Court of Coffee County on January 12, 2010. DCS first called Mr. Mansfield, who was qualified as an expert in children's psychological diagnosis and testing. He testified that when he first began seeing Melanie, most of her symptoms were expressions of physical violence and emotional abuse, but by the time he began seeing Bailey, both Melanie and Bailey began to allege sexual abuse as well. He recounted the girls' disclosures, and stated that he found the girls to be truthful.

Mr. Mansfield also testified that the girls' allegations were supported by indicators of sexual abuse, namely that both girls suffered from PTSD, exhibited sexualized and aggressive behavior inappropriate for children of their age, and experienced frequent incidents of encopresis and enuresis. Mr. Mansfield also stated that, based on his research and experience, children very rarely make false accusations of sexual abuse; studies done on the subject revealed that only one to five percent of such allegations turn out to be false or fabricated. He found it important that, even after being placed in separate foster homes, Melanie and Bailey maintained that the abuse had occurred, and reported it to several different adults over the course of several months. He also stated it was not uncommon for children to use terms they know and are familiar with to explain events in their lives and things that have happened to them, for example the use of "kitty" to refer to their vaginas. Mr. Mansfield concluded his testimony by stating that while the impact of Mr. R.'s abuse was severe, both girls improved dramatically after being placed in foster care.

Dr. J. Richard Navarre, a physician and faculty member in the Division of Child and Adolescent Psychiatry at Vanderbilt University, presented testimony by deposition. He explained that he performed a psychiatric evaluation of Melanie during her sixteen-day hospitalization at Vanderbilt Children's Hospital from October 24 to November 9, 2007. He testified by deposition stating, *inter alia*, that to determine whether a child is fabricating a story of sexual abuse, he considers the child's behavior and history; that Melanie displayed behaviors consistent with her allegations of sexual abuse, and that her aggressive behavior was also indicative of a child experiencing ongoing abuse. He also explained that children who are sexually abused tend to withhold information about their abuse to their therapists or doctors initially; however, as they get to know these adults better and understand their situation more clearly, they become more open and disclose more. Dr. Navarre then testified that, based on Melanie's symptoms, her medical history, and the fact that she consistently identified Mr. R. as her abuser, he believed "with a reasonable degree of medical certainty" that Melanie had been physically and sexually abused, and that Mr. R. was the abuser.

DCS also called Joyce Hodges, Melanie's foster parent, and Carmen Breedlove, Bailey's foster parent. They testified that both girls exhibited inappropriate sexual behaviors while in foster care; they also relayed each of the girls' allegations of abuse. The case was then continued until January 22, 2010. At that time, DCS case supervisor Karla Haws introduced the case records of Melanie's former DCS case manager, Richard Ferencei, because Mr. Ferencei passed away prior to the hearing. Counsel for Mr. R. immediately objected to the introduction of Mr. Ferencei's records on hearsay grounds. However, the circuit court held that the notations and documents Mr. Ferencei produced and compiled for Melanie's file met the business record exception, and they were admitted into evidence.

The last witness DCS called was Mrs. R. She testified about her violent and angry relationship with Mr. R. and stated examples of physical abuse of the children by Mr. R. She also testified that she had never seen Mr. R. sexually abuse the children, but that they had told her on numerous occasions that he had done so.

Counsel for Mr. R. first called Officer Ty Brazier of the Tullahoma Police Department. He testified that he investigated the allegations of abuse in late 2007, but that he had declined to file charges against Mr. R. because he "didn't see enough evidence to file charges against anyone." The case was then continued again until February 11, 2010. Mr. R. took the stand and testified that Melanie had fabricated the allegations of sexual abuse. He admitted that on occasion he spanked Melanie and Bailey too hard while disciplining them, or spanked them too many times; however, he maintained that his actions never rose to the level of abuse, and that he had never engaged in any kind of inappropriate sexual activity with either of the girls. He asserted that Melanie had simply fabricated the stories of sexual abuse, and that both girls had been encouraged to fear him by their grandmother, Mrs. R.'s mother. He also admitted that he had been abusive to Mrs. R.

After Mr. R. closed his case-in-chief, Mrs. R. called Mary Camp, Melanie's special education teacher, as a witness. She testified that Melanie had confided in her that Mr. R. had thrown her against a wall in Mrs. R.'s home after Melanie called him a "bastard." She confirmed that she had reported the incident to DCS because Melanie had a large bump of her head. She also testified that Melanie was terrified of Mr. R., and had asked Ms. Camp and Ms. Camp's teaching assistant to "save me from [Mr. R.]." She ended her testimony by stating that, although Melanie was imaginative and liked to pretend, she was a truthful girl about important matters and could not be easily coached to lie. After Ms. Camp testified, the court took the case under advisement.

The circuit court entered the final order on May 10, 2010. The court held that DCS had proven by clear and convincing evidence that Melanie, Bailey, and Miles were dependent and neglected, and that Melanie and Bailey were victims of severe child abuse perpetrated

by Mr. R. as well as Mrs. R. Mr. R filed a timely appeal; Mrs. R. did not appeal and is voluntarily surrendering her parental rights to the three children.

Mr. R. presents several issues on appeal. He argues the court erred by denying his motion to dismiss for failure to state a claim upon which relief can be granted and by admitting the case records of Richard Ferencei, Mrs. R.'s testimony regarding their violent relationship, and the testimony of Mary Camp into evidence. He also argues the circuit court erred by finding he severely abused Melanie and Bailey.[5]

**ANALYSIS**

STANDARD OF REVIEW

The fact a child is dependent and neglected and the fact a parent, guardian or person has engaged in severe child abuse must be established by clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c); *In re H.L.F.,* 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009) (citing *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005) (holding that, despite the lack of a statutory requirement that severe child abuse be shown by clear and convincing evidence, due to the consequences of such a finding, the clear and convincing standard must be applied)). To be clear and convincing, the evidence must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re H.L.F.,* 297 S.W.3d at 233; *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007); *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable than not." *In re H.L.F.,* 297 S.W.3d at 233 (citing *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

---

[5]Although Mr. R. and Mrs. R. filed for divorce on March 3, 2008, and Mr. R. has no parental rights to Melanie and Bailey, he challenges the court's finding of severe abuse because, pursuant to Tenn. Code Ann. §36-1-113(h)(1)(C), upon a finding of severe child abuse as to Melanie and Bailey, DCS is required to file a petition seeking termination of his parental rights of Miles, his biological son. *See Id.* (The department shall file a petition to terminate the parental rights of the child's parents . . . under the following circumstances: If a court of competition jurisdiction has made a determination in a . . . civil proceeding that the parent has committed . . . severe child abuse as defined at § 37-1-102 to the child that is the subject of the petition or any sibling or any half-sibling of the child who is the subject of the petition.).

This court reviews the trial court's findings of fact de novo on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *In re H.L.F.,* 297 S.W.3d at 233. If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, this court will afford great weight to those credibility determinations, and will not reverse such determinations absent clear evidence to the contrary. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *In re H.L.F.,* 297 S.W.3d at 233.

Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence is a question of law, which we review de novo with no presumption of correctness. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) ("As a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment [is] reviewed de novo with no presumption of correctness."); *see also In re Valentine*, 79 S.W.3d at 548 (holding that the question of substantial noncompliance with the requirements of a permanency plan is a question of law reviewed de novo with no presumption of correctness). To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tenn. R. App. P. 13(d): de novo with a presumption of correctness, unless the evidence preponderates otherwise. *See In re H.L.F.,* 297 S.W.3d at 233; *see also In re the Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re M.L.P.*, 228 S.W.3d at 143-44.

Therefore, this court will review the trial court's specific findings of fact in support of its ultimate conclusions de novo with a presumption of correctness pursuant to Tenn. R. App. P. 13(d), and we will review the court's conclusions of law drawn from those factual findings, that the children are dependent and neglected and that the parents engaged in severe chid abuse, de novo with no presumption of correctness. *In re H.L.F.*, 297 S.W.3d at 233-34.

## I.

Mr. R. contends the circuit court erred by not dismissing the petition against him, because DCS failed to state a claim *against him* upon which relief could be granted. He asserts that because he lacks a "biological relationship" or "parental rights" to Melanie and Bailey, it was error to find that he severely abused them.[6] Stated another way, he argues that, as a matter of law, severe abuse cannot be found against a person who is not a biological or legal parent of the child alleged to have been abused; thus, Mr. R. insists he cannot be found to have severely abused Melanie or Bailey because he was their step-father. We find no merit to these assertions and that, as the trial court correctly found, DCS did properly state a claim against Mr. R. upon which relief could be granted.

---

[6]Mr. R. is the biological father of Miles; however, the circuit court did not find that Mr. R. had severely abused Miles, only Melanie and Bailey.

For the purpose of juvenile proceedings in Tennessee, a "child" is defined as: "A person under eighteen (18) years of age." Tenn. Code Ann. § 37-1-102(b)(4)(A). In other words, the statutory scheme defines "child" in terms of age, rather than in terms of a particular relationship with an adult. *See id.* Furthermore, a "dependent and neglected child" is defined as a child:

(A) Who is without a parent, guardian or legal custodian;

(B) *Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child*;

(C) Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

(D) Whose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child;

(E) Who, because of lack of proper supervision, is found in any place the existence of which is in violation of law;

(F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G) Who is suffering from abuse or neglect;

 . . . .

Tenn. Code Ann. § 37-1-102(b)(12)(A)-(G) (emphasis added).

Thus, it is clear that a biological or legal parent/child relationship is not essential to uphold a finding that a minor is "dependent and neglected." Tenn. Code Ann. § 37-1-102(b)(12). The statute expressly states that a "child" is "dependent and neglected" if that child lives with a "parent, guardian or *person*" who "*by reason of cruelty, . . . immorality or depravity is unfit to properly care for such child.*" *Id.* at (b)(12)(B) (emphasis added). By using the words "parent, guardian or *person* with whom the child lives," the General Assembly made it perfectly clear that a dependent and neglected claim under Tenn. Code Ann. § 37-1-102(b)(12)(B) does not require that the "unfit" person be a biological or legal parent of the child at issue. *See id.* (emphasis added). Therefore, a person who lives with a child need not be a biological or legal parent of the child in order for a "dependent and neglected" action to be maintained against that person. See Tenn. Code Ann. §37-1-102(b)(12)(B).

In a dependency and neglect action such as the case at bar, if the trial court finds that the child who is the subject of the petition is "dependent and neglected," it "shall" go on to

"determine whether the parents or either of them or another person who had custody of the child committed severe child abuse." Tenn. Code Ann. § 37-1-129(a)(2). The statutory provisions regarding "severe child abuse" are similarly not limited in application to biological or legal parents. Rather, if the judge finds the child to be dependent or neglected, then the judge must go on to determine whether "the parents or either of them or *another person who had custody of the child* committed severe child abuse." *Id.* (emphasis added).

"Custody" is defined as, "the control of actual physical care of the child and includes the right and responsibility to provide for the physical, mental, moral and emotional well-being of the child." Tenn. Code Ann. § 37-1-102(b)(8). It is undisputed that Melanie and Bailey resided in the home of their mother and Mr. R., their stepfather. For most of their lives up until the filing of this petition, Mr. R. was their father figure, and they referred to him as "Daddy." Their teachers were aware he was their stepfather. It is also undisputed that Mr. R. exercised control over their physical care and had the right and responsibility to provide for their physical, mental, and emotional well-being. Mrs. R. did not work; Mr. R. was largely responsible for providing for the children. Furthermore, he frequently disciplined them when he or Mrs. R. felt they were misbehaving. Accordingly, we find that Mr. R. falls within the description of "another person who has custody of the child" as contemplated in Tenn. Code Ann. § 37-1-129(a)(2).

The same statutory scheme goes on to define "severe child abuse" as:

(A) The knowing exposure of *a child* to or the knowing failure to protect *a child* from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on *a child* that is likely to cause great bodily harm or death;

(B) Specific brutality, abuse or neglect towards *a child* that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of *the child's* ability to function adequately in the child's environment, and the knowing failure to protect *a child* from such conduct;

(C) The commission of any act towards *the child* prohibited by §§ 39-13-502[,] 39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect *the child* from the commission of any such act towards *the child* . . . .

Tenn. Code Ann. § 37-1-102(b)(23)(A), (C) (emphasis added). The statute focuses on conduct that constitutes severe abuse of "a child," which, as we have previously stated,

-10-

simply refers to the age of the person being abused, and not to any particular legal or biological relationship the abused shares with the perpetrator of the abuse.

The foregoing statutory provisions do not, in any way, restrict the definition of "severe child abuse" to abuse perpetrated on a child by his or her biological or legal parent; moreover, we find it is illogical to suggest that a child can only be severely abused by his or her biological or legal parent under Tennessee's statutory scheme.

We find no merit in Mr. R.'s contention that, because he is not a biological or legal parent of Melanie and Bailey, the petition failed to state a claim against him upon which relief could be granted. We therefore affirm the trial court's denial of Mr. R.'s motion to dismiss on this basis.

**II**.

Mr. R. asserts that the trial court erred by admitting into evidence statements of alleged domestic violence between Mr. and Mrs. R. as well as the testimony of Mary Camp, Melanie's special education teacher. He contends this evidence was not relevant under Tenn. R. Evid. 401 & 402 and, therefore, should not have been admitted. He also asserts the trial court erred in finding that the file maintained by Melanie's former DCS case manager, Richard Ferencei, was admissible hearsay under the exception for business records, Tenn. R. Evid. 803(6).

The admission or exclusion of evidence is within the trial court's discretion, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 2002) (citing *Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn. 1998); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992)). Although the discretionary nature of the decision does not shield it completely from appellate review, it does result in less rigorous appellate scrutiny. *Id.* (citations omitted). When the trial court's discretionary decision involves a choice among acceptable alternatives, the appellate court may not second-guess the trial court's exercise of its discretion merely because "the trial court chose an alternative the appellate courts would not have chosen." *Id*. at 223 (citing *Overstreet v. Shoney's*, 4 S.W.3d 694, 708) (Tenn. Ct. App. 1999).

If the appellate court concludes that a trial court improperly excluded otherwise admissible evidence, "[t]he erroneous exclusion of evidence will not require reversal of the judgment if the evidence would not have affected the outcome of the trial even if it had been admitted." *Id*. (citing *Hensley v. Harbin*, 782 S.W.2d 480, 482 (Tenn. Ct. App. 1989); *Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn. Ct. App. 1987)). Moreover, if the trial court improperly admitted testimony or records into evidence over the objection of the adverse party, the error will be considered harmless, "unless a substantial right of the party is

affected." Tenn. R. Evid. 103(a); *see also* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

## A.

Rule 401 of the Tennessee Rules of Evidence defines "Relevant Evidence," as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 402 provides that "[e]vidence which is not relevant is not admissible." Tenn. R. Evid. 402.

The trial court admitted evidence of incidents of domestic violence between Mr. R. and Mrs. R. that occurred outside the presence of the children in order to show "an atmosphere of intimidation and fear." Mr. R. contends that this evidence is not relevant and should have been excluded. DCS contends this evidence is relevant because it tends to make a fact of consequence to the determination of the action more probable than it would be without the evidence.

A dependent and neglected child is one who, *inter alia*, is suffering from abuse and neglect. See Tenn. Code Ann. § 37-1-102(b)(12)(G). Abuse of a child is defined under our statutory scheme as one who is "suffering from or may be in immediate danger of suffering from or sustaining a . . . mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker." Tenn. Code Ann. § 37-1-102(b)(1). Evidence concerning Mr. R.'s violent behavior with the children's mother is relevant in this action because it makes it more probable that the children were suffering in conditions which had an adverse affect on their mental health as a result of the abusive and violent atmosphere that existed in the home. *See* Tenn. R. Evid. 401. We therefore find it was properly admitted into evidence.

## B.

Mr. R. similarly contends that the testimony of Melanie's teacher, Mary Camp, is not relevant.

Mary Camp testified as to the abuse Melanie revealed to her while Ms. Camp was her teacher. She also stated that she would "characterize Melanie as truthful" and that "when it's something that matters . . . [Melanie] tends to tell the truth." We find Ms. Camp's testimony was relevant because, prior to Ms. Camp testifying, Mr. R.'s attorney put Melanie's reputation for truthfulness at issue, particularly in the cross examination of Mr. Mansfield.

C.

Mr. R. also asserts that the trial court erred by admitting into evidence the case records of Richard Ferencei, the DCS investigator and one of Melanie's case managers, who died prior to trial. The trial court admitted the evidence under the hearsay exception in Tenn. R. Evid. 803(6) for business records. Mr. R. contends that because there was a rather significant delay between the time Mr. Ferencei observed Melanie and when he entered the records into her file, the case records do not qualify as an admissible business record under Tenn. R. Evid. 803(6).

The determination of whether a hearsay statement is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court. *Arias v. Duro Standard Products Co.,* 303 S.W.3d 256, 262 (Tenn. 2010). Tenn R. Evid. 803(6) identifies the prerequisites for admission as follows:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . , unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

The business records exception "rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable." *Arias,* 303 S.W.3d at 262 (quoting *Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995)). Rule 803(6) incorporates five criteria, each of which must be satisfied for a document to be admissible under the business records exception:

> 1. The document must be made at or near the time of the event recorded;
> 2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;
> 3. The person providing the information in the document must be under a business duty to record or transmit the information;
> 4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*Id*. at 263 (quoting *Alexander*, 903 S.W.2d at 700).

DCS acknowledges that Mr. Ferencei's records may not qualify under the business records hearsay exception and the record before us fails to establish that the above criteria were satisfied. Therefore, the records of Mr. Ferencei do not qualify under the business records exception.

Nevertheless, as DCS asserts, the circuit court judge expressly acknowledged that she only relied on the records as a time line, not for the truth of the matters asserted therein. The time line is important because Mr. and Mrs. R. were frequently separated, and the court used the time line to understand "when [Melanie and Bailey] say certain events occurred or when [Mr. R.] was present." Accordingly, it was not error to consider only that portion of the information contained in his records for the sole purpose of establishing a time line. Moreover, the substantive and material evidence contained therein was testified to by other witnesses at trial. Therefore, if it was error to admit Mr. Ferencei's records into evidence, it was harmless error. *See* Tenn. R. App. P. 36(b).

**III.**

Finally, Mr. R. asserts that the circuit court erred in finding that he severely abused Melanie and Bailey; he insists the evidence offered at trial was insufficient to satisfy the clear and convincing standard of proof.

As discussed above, "severe child abuse" is defined in Tenn. Code Ann. § 37-1-102(b)(23), and includes "specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis . . . neurotic disorder . . . depression . . . or severe impairment of the child's ability to function adequately in the child's environment," as well "the knowing failure to protect a child from such conduct." *Id.* at (b)(23)(B).

Furthermore, "the commission of any act towards the child prohibited by §§ 39-13-502[,] 39-13-504, 39-13-522, 39-15-302, and 39-17-1005" constitutes severe child abuse. *Id.* at (b)(23)(C). Two of the acts specified in part (b)(23)(C) are relevant to this case: Tenn. Code Ann. § 39-13-522, Rape of a Child, and Tenn. Code Ann. § 39-13-504, Aggravated Sexual Battery. The rape of a child is defined as "the sexual penetration of a victim who is less than thirteen (13) years of age," Tenn. Code Ann. § 39-13-522(a); and aggravated sexual battery is defined as "sexual contact with a victim" when "the victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4).

With regard to both Melanie and Bailey the circuit court found, by clear and convincing evidence that:

> [Melanie and Bailey] have suffered brutality, abuse and neglect committed by both [Mr. and Ms. R.]. [Mr. R.] has picked the children up by the head, yelled in their face, slammed them into the wall, hit them with a belt and committed acts of violence against Mrs. R. Although not as severe as the physical abuse by [Mr. R.], [Mrs. R.] has also hit the children and yelled at them. She has also failed to protect them from the abuse by [Mr. R.]. As a result, qualified experts have diagnosed these children as having post traumatic stress disorder. Both [Mr. and Mrs. R.] have knowingly failed to protect these children from this brutality, abuse and neglect. Therefore, the Court holds that [Mr. and Mrs. R.] have committed severe child abuse toward Melanie and Bailey as defined by Tenn. Code Ann. § 37-1-102(b)(23)(B).

The trial court also found that:

> Based upon the credible testimony of Daniel Mansfield, Joyce Hodge[s], Carmen Breedlove, Mary Camp, and Dr. Navarre, and the Exhibits entered into evidence at the hearing of this matter, this court finds by clear and convincing evidence that [Mr. R.] intentionally touched Melanie's intimate parts for the purpose of sexual arousal, and that she is less than thirteen years old. Therefore, the Court holds that Mr. R. has committed severe child abuse toward Melanie as defined by Tenn. Code Ann. § 37-1-102(b)(23)(B).

Mr. R. contends these conclusions were not supported by clear and convincing evidence in the record, the heightened standard of proof required for a finding of severe child abuse. *See Dep't of Children's Servs. v. David H.*, 247 S.W.3d 651, 655 (Tenn. Ct. App. 2006). We disagree.

The record is replete with credible evidence that Mr. R. repeatedly brutally abused Melanie and Bailey sexually, physically and emotionally. Consistent statements, found credible by their counselors, doctor and teachers, were made by the two children over a period of two years regarding physical and sexual abuse. Melanie and Bailey each separately and independently disclosed abuse by Mr. R. in graphic terms, sometimes with drawings, to Mr. Mansfield, Ms. Hodges, Ms. Breedlove and Mrs. R. Every witness to whom Melanie and Bailey disclosed abuse by Mr. R. testified that they believed the children were truthful. The only witness to challenge their truthfulness was Mr. R.

There were also non-verbal indicators of abuse. Mr. Mansfield testified that both children suffer from encopresis and enuresis, which, he explained, is typical in children who have suffered sexual abuse. They both engaged in inappropriate displays of affection, including sexual knowledge and sexual behavior inappropriate for children of their age. They both exhibited aggressive behavior, bursts of anger, and violent tendencies. Several witnesses also testified that both girls exhibited fear of Mr. R; they hid when the doorbell rang even when they were living in foster homes, Melanie also panicked when driving past Mr. R.'s workplace.

Our courts recognize that statements by a young child, made over a period of time to different people under circumstances and in situations that were not unduly suggestive or directive regarding sexual abuse by an adult, may constitute clear and convincing evidence that the child was sexually abused, especially when coupled with the exhibition of sexualized behavior and the development of psychological and emotional problems, as was present in this case. *See In re S.M.C. & J.L.C.*, No. 01A01-9807-JV-00358, 1999 WL 378742, at *4 (Tenn. Ct. App. June 11, 1999).

The expert testimony by Dr. Navarre and Mr. Mansfield and at trial provides additional support. Dr. Navarre, who treated Melanie over a sixteen-day period in October and November 2007, testified that based on Melanie's history, the consistency of her allegations, and the symptoms and behavior he observed in her during the treatment, including displays of adult themes when playing with other children, drawing and coloring of phallic symbols, angry outbursts, and masturbation, he believed Melanie was sexually abused and that Mr. R. was the abuser, and he stated that his opinions were based upon a reasonable degree of medical certainty.

Mr. Mansfield also testified at trial that, based on his experience and research, it is very uncommon for a child to make false accusations of sexual abuse, and that statistically only one to five percent of these accusations are false.

Mrs. R. testified to several occasions when she personally observed Mr. R. physically abusing Melanie and Bailey in a non-sexual manner She stated that Mr. R. picked the children up by their heads and lifted them into the air, he yelled in their faces, hit them with his belt, and struck them with his hands. Mrs. R. testified that Mr. R. caused Bailey's leg to be fractured when he pushed Mrs. R. into a wall while she was holding Bailey, and that when Bailey was only eighteen months old, he forced her to eat food off the floor because she dropped it from the table. Mr. Mansfield also testified that Bailey stated she would "have to hide" from Mr. R., and that he had "busted [her] ass" and "hit [her] in the face." He also reported that she had thrown several temper tantrums at school in a single day, and when asked about it, she stated it was because of Mr. R. During his testimony, Mr. R. admitted that,

-16-

when disciplining the girls, he sometimes spanked them too hard or too many times, and that he and Mrs. R. said "pretty derogatory things about each other" when they were in fights, and they had gotten into physical altercations.

Furthermore, the trial court found the testimony of these witnesses compelling and reliable, with the exception of Mr. R. When the trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference is accorded to the trial court's factual findings. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). Accordingly, we give great deference to the trial court's findings in this regard.

Having reviewed the record in detail, we have concluded that it contains clear and convincing evidence that Melanie and Bailey suffered brutal physical, sexual and emotional abuse and neglect at the hand of Mr. R., which caused them both to develop post-traumatic stress syndrome, along with a myriad of other severe mental and physical health issues, as diagnosed by qualified medical experts. Therefore, we affirm the trial court's conclusion that Mr. R. committed severe child abuse as defined in Tenn. Code Ann. § 37-1-102(b)(21)(B) against both Melanie and Bailey. We also affirm the trial court's holding that Mr. R. committed severe child abuse against Melanie[7] as defined by Tenn. Code Ann. § 37-1-102(b)(21)(C) by engaging in child rape and aggravated sexual battery.[8]

## In Conclusion

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Mr. R.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[7]The trial court did not explicitly hold that there was clear and convincing evidence Mr. R. engaged in severe child abuse under Tenn. Code Ann. §37-1-102(b)(21)(C) by committing child rape or aggravated sexual battery against Bailey. Therefore, although we find there is sufficient evidence in the record which would support such a finding, we do not hold that Mr. R. committed severe child abuse against Bailey under part (b)(21)(C). This does not affect our holding that he did commit severe child abuse against Bailey under part (b)(21)(B).

[8]Mrs. R. did not appeal the finding that she also perpetrated severe abuse on the children; therefore, we do not disturb the trial court's ruling as to her.