# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs October 22, 2012

## IN RE: WYATT S.

**Appeal from the Circuit Court for Cumberland County**
**No. CV005453      Amy V. Hollars, Judge**

**No. E2012-00539-COA-R3-JV-FILED-NOVEMBER 13, 2012**

This appeal arises from a dependency and neglect proceeding. The State of Tennessee, Department of Children's Services ("DCS") filed a petition against Lisa M. S. ("Mother") seeking to adjudicate her minor child Wyatt S. ("the Child"), born in March of 1998, dependent and neglected. The petition was rooted in the Child's disclosures that Mother had sexually abused him. The juvenile court found the Child dependent and neglected. Mother appealed to the Circuit Court for Cumberland County ("the Trial Court") for a *de novo* hearing. The Trial Court found the Child dependent and neglected by clear and convincing evidence. The Trial Court also specifically found severe child abuse in this case. Mother appeals to this Court. We affirm the judgment of the Trial Court in its entirety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Jeffrey A. Vires, Crossville, Tennessee, for the appellant, Lisa M. S.

Robert E. Cooper, Jr., Attorney General and Reporter, and, Mary Byrd Ferrara, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**Background**

In January 2011, DCS filed its Petition to Declare Child Dependent and Neglected with Protective Supervision and Restraining Order or in the Alternative for Temporary Legal Custody in the Juvenile Court for Cumberland County ("the Juvenile Court"). The petition alleged that Mother had sexually abused the Child. In March 2011, the Juvenile Court entered a restraining order against Mother barring her from contacting the Child. In August 2011, the Juvenile Court conducted a hearing on DCS's petition.[1] In September 2011, the Juvenile Court entered an order finding the Child dependent and neglected. The Juvenile Court also found the Child to be a victim of severe child abuse. Mother appealed to the Trial Court.

In January 2012, a *de novo* hearing was conducted before the Trial Court. The first portion of the hearing addressed whether the Child's psychological condition would prevent him from testifying. Vicky Startup ("Startup") testified. Startup is a licensed clinical social worker who had worked on the Child's case. Startup holds a BA degree in psychology and a master's degree in "science and social work and clinical concentration." Startup has seen clients since 2001. Startup was licensed to practice independently in 2006. Startup stated that she had taken a medical leave of absence and had not yet decided whether or not she would retire completely.

Startup went on to testify that her focus was on "trauma and especially for children who have been sexually violated and children who have been physically violated or abused and neglected." Startup estimated that she had seen "hundreds" of children in the course of her work. Startup performed counseling and diagnosis but referred out for psychological testing. Startup testified that she does not prescribe medication. The Trial Court qualified Startup as an expert on the possible ramifications to the Child if the Child testified.

Startup stated that it would be detrimental for the Child to testify. Startup testified that the Child had suffered from nightmares and flashbacks. Startup further stated that the Child was treated at Vanderbilt and that Vanderbilt's diagnosis of PTSD matched her own diagnosis. According to Startup, the Child suffered from major depressive disorder, "severe with psychotic features." Startup testified that the Child also had been treated for ADHD.

---

[1]The record contains a transcript of this hearing before the Juvenile Court. This appeal, however, concerns the final order of the Trial Court which held its own *de novo* hearing.

On cross-examination, Startup stated that she had seen the Child on an almost weekly basis from February 2010 until August of 2011. Startup testified that the Child had been at risk of suicide. Startup, replying to a question from the Trial Court as to whether it would make a difference were the Child to testify outside the courtroom, stated, "I could see him maybe going just with you if counsel was not present."

Scott Herman ("Herman") testified next. Herman was a self-employed senior psychological examiner and licensed professional counselor. Herman had practiced in the mental health profession since 1989. Herman's professional responsibilities with children have centered on working with abused children. Herman testified that he diagnoses mental disorders, treats mental disorders, and provides psychological testing, but does not prescribe medication. The Trial Court qualified Herman as an expert witness.

Herman stated that he had been involved with the Child's case since August 2011. Like Startup, Herman testified that it would be detrimental to the Child for the Child to testify in court. Herman stated this was so because the Child "is experiencing severe depression and anxiety" and "is very inconsistent emotionally." Herman also testified that it was "in the very realistic realm of possibility" that the Child might harm himself, but that he was confident there were safety plans in place to prevent a completed suicide. On cross-examination, Herman stated that, while the Child would find it easier to talk around a table, the Child would "come apart like a cheap suit in this [witness] chair."

Based on the testimony of Startup and Herman, the Trial Court found the Child unavailable to give testimony. The Trial Court stated that the Child "is not going to be able to assist the court today by offering testimony," and "trying to obtain that testimony from him might be very detrimental to the child."

The issue of whether the Child would testify having been resolved, the hearing proceeded. Startup resumed her testimony. Startup testified that it was approximately five months before the Child made a disclosure to her regarding his abuse. Startup related a host of disclosures made by the Child. The Child told Startup that Mother's girlfriend's daughter raped him. The same individual also allegedly killed the Child's cat. In another disclosure, the Child told Startup that Mother's girlfriend forced him to watch scary movies and asked him to sleep on the floor without covers. The Child told Startup that, on more than one occasion, Mother's girlfriend woke him up at night while she wore a scary clown mask.

Startup elaborated on disclosures the Child made about sexual abuse. The Child told Startup that, on a weekend visit with Mother when he was ten or eleven, she "put his penis in her and she kissed him." Startup testified that the Child was "very embarrassed and humiliated" in making the disclosure. Startup related another disclosure from the Child,

whereby a man forced the Child to perform oral sex on him, resulting in the man ejaculating in the Child's mouth. The Child described this act as "dumping," and was brought to mind of this episode by the term "Humpty Dumpty" coming up. Startup stated: "[h]e made that association [with Humpty Dumpty]. . . [t]hat's why it's a life sentence when a child has been abused . . . it never goes away." Regarding Mother and her girlfriend, Startup testified that the Child had seen "nudity and sex and maybe not just these two but other people too."

Startup testified to still more disclosures the Child had made. The Child told Startup that Mother held his head underwater in the bathtub until he "saw colors." The Child told Startup that, in another incident, Mother held a gun to his head and "pumped" it. Also, the Child conveyed to Startup an incident whereby he broke a lamp and, consequently, was required by Mother to have sex with Mother's girlfriend for one hour as punishment. The Child told Startup of incidents involving a pill being shoved down his throat, and feeling a stick in his arm after which point he had no memories of what happened. When asked if the Child could be fantasizing all these myriad incidents, Startup testified, "I don't think it was a fantasy for Wyatt. I think he was speaking truth of his reality of what happened to him." Regarding future contact with Mother, Startup testified that the Child "does not want to ever be with her again. . . ."

On cross-examination, Startup testified that she believed the Child. Startup acknowledged that the Child lied at times, but when he did, it concerned non-abuse-related matters such as whether he did his homework.

Herman then resumed his testimony. Herman described the disclosures the Child had made to him. Herman testified that the Child told him that Mother "made him penetrate her with his penis but he didn't believe he ejaculated." The Child told Herman that Mother had an abortion, and the Child thought the pregnancy might have stemmed from his rape.

Herman listed the Child's symptoms: "Anxiety and depression, easily overwhelmed, socially withdrawn, inappropriate social responses, slant effect, inability to connect emotionally, averting eye contact, it could go on and on. And those could definitely be explained by multiple traumas through the developmental period." Herman stated that, according to the records he had seen, the Child had suffered flashbacks in addition to hallucinations. Herman stated that when he started seeing the Child, the Child was taking Zoloft, Xanax, and Respiridone. Herman distinguished between flashbacks and hallucinations, stating that the former is the re-experiencing of a traumatic memory, whereas the latter is a false impression. With regard to the Child's feelings concerning his rape, the Child expressed a view that it felt good. Herman stated that this was not unusual for sexually abused children.

-4-

Herman described another disclosure from the Child:

> He described [Mother] taking him to a home where he was sexually abused in her presence by two men. And he described full anal intercourse. And I was reviewing my notes back there, and I don't have the note from the last session with me, but he disclosed that one of the men during that episode gave him a pill.

According to Herman, the Child stated that Mother was present for that incident, and that she laughed and asked the Child "how he liked it." Herman described another disclosure of the Child's:

> He reports that, and I think this is a different occasion but I was never able to be sure, his mother took him to the home of two men; they came and got him and put something over his eyes and he was carried downstairs and they made him get on his hands and knees and each man had intercourse with him several times. He reported his mom and girlfriend were sitting on the couch.

Herman also described how the Child wore a heavy sweater in his office when the temperature did not justify such wardrobe. Herman stated that children with PTSD sometimes want to protect themselves in this manner. Herman said schizophrenia also was a possibility.

On cross-examination, Herman was questioned about the possibility of schizophrenia being responsible for the Child's disclosures, especially in light of previous testimony about Father and his antisocial traits, and the genetic aspect of schizophrenia. Herman stated that the onset of schizophrenia tends to be gradual and that it occurs fairly rarely in a person of the Child's age. The following exchange occurred on this subject:

Q.   On the basis of what you know now can you rule out, and I feel a double negative coming on but I'm going to say it, can you rule out that Wyatt does not have schizophrenia and that his statements about sexual abuse by his mother and others are hallucinations, delusions, illusions, or some combination thereof?

A.   I have no basis to establish or rule that out at this point.

Q.   Further research needs to be done on the schizophrenia, I guess; is that correct?

A. Yes, I want to arrange, and again, I regret this has come out this way because this wasn't something I was preparing for court, that was to remind me of a conversation that we had. But I had been wanting to plan with the case manager and the grandparents another session just about dealing with this, and it will probably be ruled out, but I want to make sure.

Herman also distinguished age-appropriate beliefs from delusions. Herman stated, for example, that children might well believe in Santa Claus, but this would not constitute a delusion. Rather, a young child's belief in Santa Claus would be "culturally congruent."

Mother testified. Mother testified that William D. R. ("Father") was the Child's father. Mother was with Father for about a year. Father left just before the Child was born. Mother described Father's personality, stating he "would get very angry sometimes" and "was real anti-social." For her part, Mother denied sexually abusing the Child and stated that she had never seen anyone else abuse the Child. Mother testified that she "would have killed" anyone who sexually abused the Child. Mother stated that she had never been criminally charged with sexually abusing the Child.

Mother acknowledged that she had drank heavily. Mother had received numerous DUIs, and was once sentenced to five months incarceration as a result of her multiple DUIs. Regarding her alcohol abuse, Mother stated: "Yes, I messed up. I drank too much and I highly regret that."

On cross-examination, Mother testified that the Child shared certain antisocial characteristics of Father. Regarding the Child's allegations about her conduct, Mother testified: "I mean, [the Child]'s scared and maybe he's scared that I won't stop drinking and he don't want me around him but he knows I didn't abuse him." Mother continued: "I'm on an anti-depressant. I've thought about suicide myself because I'm so bummed out about this with my son. And now these accusations, what do you think I'm going through because I know I didn't do it?" Mother stated that she had been sober for about two months. Mother then testified concerning her girlfriend, Pamela Y. ("the Paramour"). Mother stated that the Child had never seen Mother and the Paramour naked together in bed.

Mother had few unsupervised visitations with the Child from 2004 to 2011. The Child had lived with his grandparents. When asked if she had any problems with the way the Child was being raised by her mother and the Child's step grandfather, Mother stated that she did not, except that the grandparents allegedly were too hard on the Child by being "very disciplinary." Mother stated that she thought the Child would be well-taken care of by the grandparents in terms of money, and would get a college fund. With respect to the

Child's disclosure regarding Mother's abortion, Mother denied ever having had an abortion in her life.

The Paramour testified. The Paramour denied ever sexually abusing the Child, or seeing anyone else do so. The Paramour had lived with Mother on and off for eleven years. According to the Paramour, Mother abused alcohol and the two of them had engaged in bouts of domestic violence. The Paramour testified the two of them had fought in front of the Child.

In February 2012, the Trial Court entered its Adjudicatory Order. In its order, the Trial Court found the Child dependent and neglected by clear and convincing evidence. Furthermore, the Trial Court found, by clear and convincing evidence, that the conduct toward the Child constituted rape of a child, aggravated sexual battery, and incest, pursuant to Tenn. Code Ann. §§ 39-13-522, 39-13-504, and 39-15-302, respectively. This conduct constitutes severe child abuse under Tennessee law. The Trial Court found and held, in part:

1. This appeal presents the Court with a really troubling and novel case. It, is troubling, of course, for the obvious reasons that horrific allegations of abuse are at issue in the case. It is also novel in that the child has not testified or given statements to the Court in the presence of counsel in chambers because of the reasons previously stated by the Court at the hearing: the child was considered unavailable by reason of his mental condition, which was extremely fragile, as testified to by Scott Herman and Vicky Startup.

2. The Court finds that Wyatt [S.] is dependent and neglected pursuant to T.C.A. 37-1-102(b)(12)(B)&(G). The standard to be applied her[e] is the clear and convincing standard of proof, a more exacting standard than a preponderance of the evidence standard, but it does not require such certainty as beyond a reasonable doubt. Clear and convincing evidence is the degree of evidence that would produce in the fact finder's mind a firm belief or conviction with regard to the truth of the allegation sought to be established. In applying that standard to the proof here on the issue of severe abuse and neglect the Court finds that Wyatt [S.] has been the victim of severe abuse and neglect perpetrated by his mother, Lisa [M. S.], the Respondent, and others with her knowledge.

3. The Court further finds that the conduct rises to the standard of the statutory definition of Rape of a Child as defined by T.C.A. § 39-13-522, Aggravated Sexual Battery as defined by T.C.A. § 39-13-504 and Incest as defined by T.C.A. § 39-15-302.

4.     In reviewing the evidence that was submitted the Court found the following to be important in reaching this decision:

a.     Scott Herman testified that before he got medical records from other providers he talked to the child and did therapeutic exercises so that he could get a fresh impression of what was going on with Wyatt and so that his opinions would be uninfluenced by those of the previous providers. Upon preliminary testing Wyatt had a childhood abuse scale that was very elevated and also self-devaluation scores that were very high. Shortly thereafter in an interview with Scott Herman, or a session with Scott Herman, Wyatt disclosed that his mother had raped him and that she had caused him to penetrate her. In making this disclosure he was uncomfortable and reserved, as would be expected of a child making such a disclosure. He also reported to Mr. Herman that his mother had left him with a male friend who had sex with him. He also reported that this had happened with two men or with random people he had been left with. There was another disclosure, and Mr. Herman was unsure if this was a repeated disclosure of the same incident, in which Wyatt described two men in the home getting him out of bed and bringing him downstairs and having anal intercourse with him and then one of the men saying he could go back to bed. Wyatt said this was in the presence of his mother.

One of the other things Mr. Herman thought was important was when Wyatt made such disclosures about abuse by his mother he looked down as if ashamed or as if he was feeling guilty and said that when his mother raped him it felt good. Scott Herman testified this is very normal of children who have experienced prolonged abuse and normal with a sexualized child.

b.     To Ms. Startup, consistent disclosures were made. The disclosure regarding abuse by the mother was consistent with that made to Mr. Herman. Wyatt also told Ms. Startup that when that occurred his mother had been drinking. Wyatt also became very upset in one of the sessions when some reference was made to Humpty Dumpty; he associated that with having oral sex with a man and the "dumping" was the term for the man's ejaculation into the mouth.

c.     Defense made cogent arguments that Wyatt's disclosures were attributable to early onset schizophrenia. Mr. Herman said that would need to be ruled out, but he said that early onset schizophrenia would be extremely rare and would not be of sudden occurrence or it would not come on suddenly as this has apparently with Wyatt. Scott Herman also made references to the age

appropriateness of delusions. He was questioned about whether these accounts Wyatt has made could be delusions and he mentioned the age appropriateness factor and that factor is important to the Court. The Court cannot understand how Wyatt at the age of the disclosures would have had such a highly developed knowledge of sexual activity and even developed a slang vocabulary to refer to some sexual acts, such as his reference to "dumping."

d.      Both Mr. Herman and Ms. Startup have diagnosed Wyatt with post traumatic stress disorder (PTSD). Mr. Herman said Wyatt may have a complex type of PTSD. Ms. Startup referenced the Vanderbilt admission where the same diagnosis was made of Wyatt.

These are some of the facts that lead the Court to believe that the disclosures that Wyatt made are credible and there is clear and convincing evidence in the case Wyatt is the victim of severe abuse and neglect.

**IT IS THEREFORE ORDERED:**

Pursuant to the above findings by the Court, the restraining order barring contact with the Respondent, Lisa [M. S.], will remain in place permanently and the grandparents, William and Patricia [E.], will retain custody of Wyatt.

Mother appeals to this Court.

## Discussion

Though not stated exactly as such, Mother raises two issues on appeal: 1) whether the Trial Court erred in finding, by clear and convincing evidence, that the Child is dependent and neglected; and, 2) whether the Trial Court erred in finding, by clear and convincing evidence, severe child abuse in this case.

A finding of dependency and neglect must be based upon clear and convincing evidence. Tenn. Code Ann. § 37–1–129 (Supp. 2012). Our review, however, is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). As this Court discussed in *In re: H.A.L.*:

Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence.

However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion.

*In re: H.A.L.*, No. M2005–00045–COA–R3–PT, 2005 WL 954866, at *4, n.10 (Tenn. Ct. App. April 25, 2005), *no appl. perm. appeal filed*, (discussing the clear and convincing standard in a case involving a termination of parental rights). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Our Supreme Court has discussed the clear and convincing standard:

The "clear and convincing" standard falls somewhere between the "preponderance of the evidence" in civil cases and the "beyond a reasonable doubt" standard in criminal proceedings. To be "clear and convincing," the evidence must "produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Hobson v. Eaton*, 19 Ohio Misc. 29, 399 F.2d 781, 784 n. 2 (6th Cir. 1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969). "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). *See e.g. In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. App.1993).

*Estate of Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997) (quoting *Fruge v. Doe*, 952 S.W.2d 408, 412 n. 2 (Tenn. 1997)).

As pertinent to this appeal, a dependent and neglected child is one "[w]hose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child." Tenn. Code Ann. § 37-1-102 (b)(12)(B) (Supp. 2012). Additionally, a dependent and neglected child also is one "[w]ho is suffering from abuse or neglect." Tenn. Code Ann. § 37-1-102 (b)(12)(G) (Supp. 2012).

Tennessee law provides that, if the petition alleges dependency and neglect on the basis of Tenn. Code Ann. § 37-1-102 (b)(12)(G), the trial court then "shall determine whether the parents or either of them or another person who had custody of the child committed severe child abuse." Tenn. Code Ann. § 37-1-129 (a)(2) (Supp. 2012). However, a trial court may make a finding of severe child abuse "if the court so finds regardless of the grounds alleged in the petition. . . ." *Id*. Here, the Trial Court made a finding of severe child

abuse in the form of rape of a child, aggravated sexual battery, and incest pursuant to Tenn. Code Ann. §§ 39-13-522, 39-13-504, and 39-15-302, respectively. *See* Tenn. Code Ann. § 37-1-102 (b)(23) (2010).

A finding of severe child abuse, like a finding of dependency and neglect, requires clear and convincing evidence. *Dep't of Children's Servs. v. David H.*, 247 S.W.3d 651, 655 (Tenn. Ct. App. 2006). A finding of severe child abuse is significant, among other reasons, in that it can serve as a basis for the termination of parental rights at a later proceeding. Tenn. Code Ann. § 36-1-113 (g)(4) (Supp. 2012).

We first address whether the Trial Court erred in finding, by clear and convincing evidence, that the Child is dependent and neglected. Initially, we observe that this appeal presents facts of a shocking nature. The testimony of the two witnesses who counseled the Child and heard his disclosures illuminates a litany of outrageous actions, including rape, perpetrated against the Child by Mother and other adults around her. The evidence additionally shows that the Child suffers from PTSD and severe depression.

The evidence in the record does not preponderate against the Trial Court's finding that the Child's assertions as disclosed to Startup and Herman were true. These disclosures had a consistency and persistence. There was no indication from the record that the Child was coerced or pressured into making these specific disclosures. Furthermore, we find it significant, as did the Trial Court, that the Child had such a breadth and scope of knowledge about sexuality, including crude sexual terms like "dumping." All of these facts, combined with the Child's severe emotional and psychological afflictions, leave us without a substantial or serious doubt that the Child has been subjected to abuse and neglect.

On appeal, the crux of Mother's argument is that the Child may in fact be suffering from schizophrenia and thus could be fantasizing the depraved actions of Mother. Speculation, however, will not suffice to overturn the detailed descriptions of abuse the Child related to his counselors. While Herman acknowledged that the Child could be afflicted by schizophrenia, this unlikely *possibility* does not negate the abundant accounts of abuse contained in the record. Neither counselor testified that they believed the Child was fabricating the abuse. We have discussed what evidence can support a finding, by clear and convincing evidence, of sexual abuse against a child:

> Our courts recognize that statements by a young child, made over a period of time to different people under circumstances and in situations that were not unduly suggestive or directive regarding sexual abuse by an adult, may constitute clear and convincing evidence that the child was sexually abused, especially when coupled with the exhibition of sexualized behavior

and the development of psychological and emotional problems, as was present in this case. *See In re S.M.C. & J.L.C.*, No. 01A01–9807–JV–00358, 1999 WL 378742, at *4 (Tenn. Ct. App. June 11, 1999).

*In Re Melanie T.*, 352 S.W.3d 687, 702 (Tenn. Ct. App. 2011).[2]

Mother also argues that it is significant that Mother denied abusing the Child. The Trial Court rendered implicit credibility determinations regarding Mother. We do not lightly overturn credibility determinations of trial courts. As our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). We find nothing in the record that would serve to overturn the Trial Court's implicit credibility determination with respect to Mother.

The evidence in the record on appeal does not preponderate against the findings of the Trial Court. We find, as did the Trial Court, clear and convincing evidence that the Child is dependent and neglected.

We next address whether the Trial Court erred in finding, by clear and convincing evidence, severe child abuse in this case. The Trial Court made a finding of severe child abuse based on rape of a child, aggravated sexual battery, and incest pursuant to Tenn. Code Ann. §§ 39-13-522,[3] 39-13-504,[4] and 39-15-302,[5] respectively.

---

[2]Though neither party raises it, we are aware of *State v. Ballard*, 855 S.W.2d 557 (Tenn. 1993), and its progeny, which restricts the use of expert testimony regarding PTSD in cases concerning child sexual abuse. We believe *Ballard* is not controlling in this appeal because the witnesses testified to the specific disclosures of abuse made by the Child and did not rely on generalized symptoms of PTSD.

[3]Tenn. Code Ann. § 39-13-522 (Supp. 2012) provides:

(continued...)

The evidence in the record on appeal supports a finding that Mother, among other

[3](...continued)
 (a) Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age. . . .

[4]Tenn. Code Ann. § 39-13-504 (2010) provides:

 (a) Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

(2) The defendant causes bodily injury to the victim;

(3) The defendant is aided or abetted by one (1) or more other persons; and

(A) Force or coercion is used to accomplish the act; or

(B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

(4) The victim is less than thirteen (13) years of age.

(b) Aggravated sexual battery is a Class B felony.

[5]Tenn. Code Ann. § 39-15-302 (2010) provides:

 (a) A person commits incest who engages in sexual penetration as defined in § 39-13-501, with a person, knowing the person to be, without regard to legitimacy:

(1) The person's natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, adoptive child; or

(2) The person's brother or sister of the whole or half-blood or by adoption.

(b) Incest is a Class C felony.

transgressions, raped the Child when he was around age ten or eleven. This fits squarely within the pertinent definition of severe child abuse. We find, by clear and convincing evidence, that the Child was a victim of severe child abuse. We affirm the judgment of the Trial Court in its entirety.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Lisa M. S., and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE

-14-