IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2021

**IN RE ANGELLEIGH R.**

**Appeal from the Circuit Court for Marshall County
No. 2019-CV-50     M. Wyatt Burk, Judge**

_____

**No. M2020-00504-COA-R3-JV**

_____

This appeal stems from the circuit court's finding that a child was dependent and neglected. In particular, Mother appeals the trial court's finding that the child was a victim of severe abuse and educational neglect. We reverse the trial court as to both determinations.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which W. NEAL MCBRAYER, J., joined, and THOMAS R. FRIERSON, II, J., filing a separate concurring and dissenting opinion.

William D. Cartwright, Murfreesboro, Tennessee, for the appellant, Amanda D.B.

Herbert H. Slatery, III, Attorney General and Reporter; Stephanie Reevers, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

### I. FACTUAL AND PROCEDURAL HISTORY

Respondent/Appellant Amanda D.B. is the parent of the child at issue, born in February 2012. In August 2018, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") became involved with the child due to concerns that the child had fleas in her hair.[1] That case was eventually closed. In October 2018, however, another

---

[1] It does not appear that this was Mother's first encounter with DCS. Mother testified that a prior landlord had evicted her due to so many visits by DCS, and Mother admitted that she had several older children that were not in her custody.

issue arose that led to the DCS involvement at issue here. Specifically, on October 17, 2018, an incident occurred at the child's school that led DCS to begin an investigation into whether the child had been sexually abused. According to the referral from the child's school, the previous day the child had her hands down the front of her pants at school. When asked why she was doing that, the child stated that she was "hurting," that it was "red down there" and that Mother's boyfriend, James M. ("Boyfriend"), "was messing with her down there." When questioned, the child made a similar disclosure to a second teacher and a DCS investigator that Boyfriend had poured hand sanitizer "down there." The child also informed a teacher and the DCS investigator that Boyfriend threatened to "put hot sauce in my eyes, he don't like me anymore and he told me to go away." The investigator attempted to interview Mother the same day, but Mother did not return the investigator's request for a phone call left at Mother's address on file with the school.

Two things happened on October 19, 2018, the order of which is not clear from the record. One, Mother removed the child from public school in favor of home-schooling. Mother later claimed that the removal was not at all related to the DCS referral, as she did not know about the investigation at the time of the removal. Mother testified that due to the child's Attention Deficit Hyperactivity Disorder ("ADHD") diagnosis and developmental delays, the school wanted the child to attend only half-days. Mother testified that she did not believe that this arrangement was in the best interest of the child, so she instead chose to home-school the child.

Two, the DCS investigator was able to interview Mother. Mother informed the investigator that the child had resided with her father in California for the bulk of the summer of 2018. Around August 2018, the father told Mother that the child had informed him that someone named "Joker" had touched her inappropriately. Mother testified that she did not know anyone called "Joker" and that she took the child to the doctor on August 21, 2018, following the disclosure. According to Mother, she asked the doctor if there were any signs that the child had been sexually abused and was informed there were no signs to confirm that any abuse occurred.[2] Records from that visit, however, do not indicate that sexual abuse was in any way discussed during the visit.

During the October 19 interview, Mother agreed to bring the child for a forensic interview the following Monday. Mother also agreed to stay with maternal grandmother and keep the child away from Boyfriend over the weekend. Later, however, Mother refused to schedule the forensic interview, and an ex parte court order was entered mandating it on October 22, 2018.[3] Mother later testified that she simply wanted additional time to obtain

_____

[2] DCS disputed that any doctor could rule out sexual abuse based on a single physical exam. The disclosure of abuse that occurred in August 2018, however, is not at issue in this case. First, the alleged abuse occurred outside of Mother's care. Second, DCS does not assert in its brief that this alleged disclosure provides the basis for the finding of severe abuse in this case. Instead, DCS asserts only that Boyfriend perpetrated abuse against the child. As such, these allegations are largely irrelevant to the case-at-bar.

[3] Mother's counsel also filed a notice of appearance on this date.

a lawyer. The investigator and police also attempted to interview Boyfriend, but he declined to be interviewed.

A videotaped forensic interview with the child occurred on or about October 22, 2018. The child is somewhat difficult to understand in the video. It is clear, however, that the child repeatedly informed the interviewer that Boyfriend had put hand sanitizer on her private area. The child's gestures made clear that she was not referring to her toe, as she pointed specifically to her groin area and indicated that Boyfriend pulled down her pants to do so. The child stated that she told Boyfriend no, but that he performed the act anyway, while wearing gloves. The child further stated that Boyfriend also poured hot sauce on that area. The child initially said that the hand sanitizer incident happened once, but then goes on to mention the hand sanitizer and hot sauce incidents as if they perhaps happened together, variously describing them as having happened on "Friday, Saturday, and 100 days," "Friday, Saturday, and Sunday," and "100 times." Upon being asked multiple times by the forensic interviewer only about the hand sanitizer incident (not the hot sauce), the child explained that it occurred during the night while Mother was sleeping. The child later stated, however, that Mother woke up and she informed Mother of the incident. The child responded variously that Mother did not care and that Mother "ground" Boyfriend and put hot sauce in his eyes. The child discussed the hot sauce allegations at times while literally standing on her head. The child also stated that the police said that someone touched her, but she stated that no one touched her.

The child's allegations against Boyfriend, however, were not limited to this possibly single incident. The child also stated that Boyfriend had stomped on her stomach during an incident in which she had vomited popcorn.[4] Moreover, the child claimed that Boyfriend killed eighteen cats, as well as a "human." According to the child, she had seen this deceased "human" buried in the ground of her neighbor's home with no head, no feet, no hands, "no body, only the body." The child claimed that she had called police on Boyfriend for this murder and that he had been arrested. The child also stated that her teachers were going to jail because they were not pretty and they kicked her.

Based on what DCS deemed the consistency of the allegations from the child, DCS substantiated the allegations of sexual abuse. On October 24, 2018, DCS filed a petition for an ex parte restraining order and injunction prohibiting contact between the child and Boyfriend in the Marshall County Juvenile Court ("the juvenile court"). This petition also specifically asked that the child be declared dependent and neglected and the victim of severe abuse.[5] The juvenile court entered an ex parte restraining order on the same day;

---

[4] It is unclear whether the vomiting occurred before or after the alleged stomping.

[5] As noted *infra*, DCS later filed an amended dependency and neglect petition. We note, however, that this petition for an ex parte order is the only pleading specifically asking that the child be declared a victim of severe abuse. It is unclear if DCS intended this petition to serve as the dependency and neglect petition, or if another petition was omitted from the record on appeal. In any event, Mother raises no argument that she was not properly on notice regarding the allegations of dependency and neglect or that

Mother retained custody, but was ordered not to permit contact between Boyfriend and the child. On October 25, 2018, the juvenile court entered an order appointing a guardian ad litem for the child.

After Mother waived the preliminary hearing, on October 29, 2018, the juvenile court entered an order finding probable cause of dependency and neglect. The order further provided that Mother was to obtain trauma counseling for the child. Mother and the child were to reside with maternal grandmother, and Boyfriend was again prohibited from having contact with the child.

By February 15, 2019, Mother had also not signed necessary releases to allow DCS to obtain records from the child's therapy, nor had Mother enrolled the child in trauma therapy. Mother claimed that the child was already in therapy and that there was a delay from the trauma therapy provider in getting the child an appointment. DCS therefore filed an amended petition for dependency and neglect on February 28, 2019, alleging that Mother was not properly providing the child with medical care.

Following a home visit, on March 13, 2019, DCS filed a petition for an ex parte restraining order to remove the child from Mother and place her in DCS custody. The petition alleged that Mother was no longer residing with maternal grandmother, but had moved back in with Boyfriend. The petition further alleged that the child, however, remained at maternal grandmother's home and was suffering from environmental neglect. Additionally, the petition alleged (1) educational neglect because Mother was not properly home-schooling the child; (2) physical abuse due to alleged discipline imposed by step-grandfather; and (3) medical neglect as Mother had still not enrolled the child in the proper trauma therapy. The juvenile court entered a protective custody order on March 14, 2019, placing the child in DCS custody and awarding Mother supervised visitation.

A second preliminary hearing was held on March 15, 2019. On April 9, 2019, the juvenile court again found probable cause that the child was dependent, abused, or neglected. The juvenile court further ruled that custody would remain with DCS, as Mother admitted she left the child with maternal grandmother without a power of attorney to allow the child to be placed in school. The juvenile court further found that Mother was absent from the child's life for a period of weeks due to the birth of a new baby, and that there was environmental and educational neglect, as well as physical abuse, as alleged in the petition. A permanency plan was created in April 2019 that allowed Mother no less than four hours of therapeutic supervised visitation per month. The goal of this permanency plan was "return to parent."

Bifurcated adjudicatory hearings were then held on the dependency and neglect petition—one on the allegations of neglect on May 13, 2019, and another on severe abuse

this case was not properly initiated.

on June 3, 2019. On June 28, 2019, the juvenile court entered an order of adjudication and disposition, finding the child had been subjected to environmental and educational neglect when Mother had left the child in the care of her maternal grandmother and failed to ensure that she was provided appropriate care. The juvenile court also determined that there was clear and convincing evidence of severe abuse, noting that the child had been "consistent in disclosures of sexual abuse to four different individuals," who the court found to be credible. The juvenile court further ruled that DCS met its burden to show, by clear and convincing evidence, that Boyfriend "sexually abused" the child. The juvenile court therefore ordered that the child would remain in DCS custody, with Mother permitted visitation. The juvenile court's order further provided that

> There shall be no contact either direct or indirect, between the adult, [Boyfriend] and the minor child. The adult and parents are advised that if this restraining order is violated that they can be held in contempt, can have custody of the child removed, and can be incarcerated for a period up to one (1) year. This restraining order shall remain in effect until the minor child reaches the age of eighteen (18) or until this order is modified.

On July 3, 2019, Mother appealed this order de novo to the Marshall County Circuit Court ("the trial court"). The case was heard on January 30, 2020. At the time of trial, the child was apparently residing at a residential treatment school. The video of the forensic interview was played for the court, and several witnesses testified, including Mother, Boyfriend, the child's former teachers, the child's former counselor, an employee of the child's current school, the DCS investigator, and the case worker. Mother and Boyfriend consistently claimed that the child was known to fabricate stories and was not being truthful when she made the allegations against Boyfriend. Indeed, the testimony was undisputed that the child suffered from developmental delays, which Mother claimed placed her functioning well below that of a child her age.[6] And the DCS investigator agreed that the child has "a propensity to make up stories," which she stated was not unusual for a six-year old child suffering from developmental delays.[7] Although police were involved in this investigation, there was no proof of any criminal charges against Boyfriend related to this incident or any other.

Mother and Boyfriend also pointed to the fact that the child had undisputedly been diagnosed with pinworms in the time around when she made the sexual abuse disclosures.[8] There was no dispute that pinworms cause discomfort in the private region, but the teachers

---

[6] Specifically, in an intake form for therapy, Mother indicated that the child was "closer to 3-4 yr old mentally."

[7] The DCS investigator further agreed that the child "struggles with the ability to distinguish actual events from imagination."

[8] Both teachers testified that the child had been diagnosed with pinworms prior to the October 17 incident, where she had her hands down the front of her pants at school. There was no evidence presented as to how long such a condition would affect the child.

testified that the child typically put her hands down the back of her pants for pinworm issues, not the front. Moreover, the evidence was undisputed that the only treatment prescribed to the child for the pinworms was oral medication. Mother and Boyfriend testified, however, that they used hand sanitizer to clean a cut on the child's toe at the time of the disclosure, and the child's former teachers confirmed that the child had a cut on her toe at the time of the disclosure. The child's former teachers further testified that they had never witnessed another teacher kick the child and obviously denied that they had kicked the child. Still, the former teachers testified that they believed the child's allegations against Boyfriend.

The proof showed that Mother did enroll the child in therapy with David Saunders at LifeCare Family Services in December 2018. Mother claimed that the child attended this therapy once a week for several months.[9] According to Mr. Saunders, however, he performed an initial intake in December 2018 and then conducted five sessions with the child in January and February 2019. There was some dispute, however, as to whether this therapy was trauma-focused. Mr. Saunders testified to his understanding that the child had previously been diagnosed with Autism Spectrum Disorder, ADHD, and Pica.[10] Mr. Saunders confirmed that Mother informed him that there was some concern about sexual abuse during the sessions, but it does not appear that Mother mentioned this issue during the initial intake. It is also unclear how specific Mother was about the allegations. In the few visits that occurred, Mr. Saunders did not see any obvious signs of sexual abuse, and the child did not make any disclosures to him of abuse. According to Mr. Saunders, those issues would have been delved into in later sessions, which did not occur following the removal of the child. Mr. Saunders also recounted a session where the child claimed to be a police officer and when asked if she was pretending or if she was "really, really a policeman," the child said she was "really, really a policeman."

An employee from King's Daughters' School, Melissa Urvan, where the child was currently enrolled, also testified. Ms. Urvan was in charge of supervising Mother's visitation with the child and testified that the child made no disclosures of abuse to her; rather, the child mentioned Boyfriend only twice to her, once stating that he did not hurt her and once stating that she missed him. After the child was removed from Mother's custody, it appears that the child was no longer required to attend any specific trauma

---

[9] Mother testified that the child was attending regular therapy appointments with a different provider prior to the therapy with Mr. Saunders. Mother testified, however, that DCS instructed Mother to enroll the child in trauma-specific therapy. Mother later admitted that the child was first treated by Dr. Saunders in December 2018. The child, of course, was removed from Mother's custody in March 2019, about four months later.

[10] Pica is generally defined as "a craving for and eating of unnatural substances such as chalk, ashes, bones, etc. generally occurring in instances of nutritional deficiency." *Dunson v. Friedlander Realty*, 369 So. 2d 792, 795 (Ala. 1979); *see also* *Jackson ex rel. Hinkle v. Allegheny Valley Sch.*, No. 3042 EDA 2014, 2015 WL 9264664, at *1 (Pa. Super. Ct. Dec. 18, 2015) ("Pica is defined as a tendency or craving to consume substances that have no nutritional value.").

therapy, and went back to generalized therapy. Ms. Urvan further testified that the child had not exhibited any "sexually reactive behaviors" in her interactions with the child.

At the conclusion of the proof, the trial court issued an oral ruling that the child was dependent and neglected and severely abused by Boyfriend. The trial court later entered a written order to this effect on March 6, 2020. Therein, the trial court made the following relevant findings:

> In considering the testimony of the witnesses here today, the court is convinced by the witnesses and the video of the forensic interview that the sex abuse occurred. The court was able to personally witness the demeanor of the witnesses, their facial expressions, and the often prolonged pauses between the questions posed and the answers given, believing that the teachers and the child were convincing, and that this court will credit their testimony that this event did in fact occur.
> The child was able to specifically articulate the manner in which this sexual act occurred and the court finds clearly and convincingly it did, in fact, occur. The child's frequent touching of this area was further evidence of this fact. When the question was posed to her; she was consistent in answering yes.

Thus, the trial court found that the child was the victim of severe abuse by Boyfriend. The trial court further ruled that educational neglect existed because Mother's efforts to home-school the child were "substantially lacking." The trial court declined, however, to find environmental neglect because it found the issues underlying that allegation had been remedied. As to disposition, the trial court ruled that custody would "remain as ordered by the juvenile court," and specifically ordered that Boyfriend would have no contact with the child. Mother timely appealed to this Court.

## II.    ISSUES PRESENTED

Mother raises the following issues, as taken from her brief and slightly restated:

1. Whether the trial court erred by finding clear and convincing evidence of severe abuse.
2. Whether the trial court erred in finding that the child is dependent and neglected due to educational neglect.
3. Whether the trial court erred by not returning the child to Mother's care and custody.

DCS designates no additional issues, but merely restates the issues raised by Mother.

## III.    STANDARD OF REVIEW

This Court has previously explained the standard of review applicable in an appeal from a dependency and neglect proceeding as follows:

A parent's right to the care and custody of his or her child is among the oldest of the liberty interests protected by the due process clauses of the federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); ***Hawk v. Hawk***, 855 S.W.2d 573, 578–79 (Tenn. 1993); ***Ray v. Ray***, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). Although this right is fundamental, and superior to claims of the government and other persons, it is not absolute. ***State v. C.H.K.***, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The right continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination, ***Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002), such as when the child is found to be dependent and neglected, *see* Tenn. Code Ann. § 37-1-130(a), or when a parent is found to have engaged in severe child abuse, *see* Tenn. Code Ann. § 37-1-130(c).

The fact a child is dependent and neglected and the fact a parent has engaged in severe child abuse must be established by clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c); ***Tenn. Dep't of Children's Servs. v. M.S.***, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005) (holding that despite the lack of a statutory requirement that severe child abuse be shown by clear and convincing evidence, due to the consequences of such a finding the clear and convincing standard must be applied). For the evidence to be clear and convincing, the evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002) (citing ***Hodges v. S.C. Toof & Co.***, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. ***In re M.L.P.***, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007); ***In re Giorgianna H.***, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. ***In re M.A.R.***, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting ***In re C.W.W.***, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

This court reviews the trial court's findings of fact *de novo* on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); ***In re M.J.B.***, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, this court will afford great weight to those credibility determinations, and will not reverse such determinations absent clear

evidence to the contrary. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995).

Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review *de novo* with no presumption of correctness. *See In re the Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (holding in a termination of parental rights case that "[a]s a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment are reviewed *de novo* with no presumption of correctness."); *see also In re Valentine*, 79 S.W.3d at 548 (holding that the question of substantial noncompliance with the requirements of a permanency plan was a question of law reviewed *de novo* with no presumption of correctness). To the extent the trial court made findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tenn. R. App. P. 13(d), *de novo* with a presumption of correctness unless the evidence preponderates otherwise. *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4 (Tenn. Ct. App. Jan. 10, 2008) (holding that findings of fact in a dependency and neglect action for severe child abuse are "presumed to be correct unless the evidence preponderates against them"); *see also In re the Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re M.L.P.*, 228 S.W.3d at 143–44. However, the trial court's conclusions of law concerning the ultimate issues are reviewed *de novo* without a presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001); *see also In re A.T.P.*, 2008 WL 115538, at *4. Therefore, this court will review the trial court's specific findings of fact in support of its ultimate conclusions *de novo,* pursuant to Tenn. R. App. P. 13(d), with a presumption of correctness; however, we will review those conclusions of law, that the parents engaged in severe child abuse and that the children are dependent and neglected, *de novo* with no presumption of correctness.

*In re H.L.F.*, 297 S.W.3d 223, 232–34 (Tenn. Ct. App. 2009).

## IV.  ANALYSIS

Here, the trial court made two findings that are at issue in this appeal: (1) that the child was a victim of severe abuse; and (2) that the child was dependent and neglected due to educational neglect. Mother appeals both findings. Tennessee Code Annotated section 37-1-102 contains various definitions for a "[d]ependent and neglected child." Relevant here, a child may be dependent and neglected if she is "unlawfully kept out of school" or "suffering from abuse or neglect[.]" Tenn. Code Ann. § 37-1-102(b)(13)(C) & (G); *see also* Tenn. Code Ann. § 37-1-102(b)(1) (stating that "abuse" exists "when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of

suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker"). We begin with the trial court's finding that the child was a victim of severe abuse.

## A. Severe Abuse

Under Tennessee Code Annotated section 37-1-129,

If the petition alleged the child was dependent and neglected as defined in § 37-1-102(b)(13)(G), or if the court so finds regardless of the grounds alleged in the petition, the court shall determine whether the parents or either of them or another person who had custody of the child committed severe child abuse.

Tenn. Code Ann. § 37-1-129(b)(2).[11] The statutory definition of severe child abuse applicable to dependency and neglect proceedings is found in Tennessee Code Annotated section 37-1-102(b)(27), which provides in relevant part:

"Severe child abuse" means:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
      (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(c);
(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to

---

[11] Although this statute speaks of parents or those with custody, neither party argues in this case that a severe abuse finding was not proper against Boyfriend because he is not the child's parent and was not her legal guardian. Boyfriend lived with Mother at the time of the allegations and participated in the child's care. Indeed, the definition of "abuse" provides that it may be perpetrated by a caregiver, *see* Tenn. Code Ann. § 37-1-102(b)(1), and the definition of severe abuse does not limit the abuse to parents or legal custodians. *See* Tenn. Code Ann. § 37-1-102(b)(27); *see also* Tenn. Code Ann. § 37-1-102(b)(4) (defining a caregiver as, *inter alia*, a person living with the child who provides care for the child). As such, we have previously upheld findings of severe abuse against stepparents in similar situations. *See, e.g.*, ***In re Madison M.***, No. M2013-02561-COA-R3-JV, 2014 WL 4792793 (Tenn. Ct. App. Sept. 25, 2014); ***In re Melanie T.***, 352 S.W.3d 687 (Tenn. Ct. App. 2011). Moreover, Tennessee law makes clear that "[n]o child who has been found to be a victim of severe child abuse shall be returned to the custody *or residence of any person* who engaged in or knowingly failed to protect the child from the brutality or abuse unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse." Tenn. Code Ann. § 37-1-130(c) (emphasis added). There is no dispute in this case that Mother and Boyfriend share a residence.

protect a child from such conduct;

(C) The commission of any act towards the child prohibited by § 39-13-309, §§ 39-13-502 -- 39-13-504, § 39-13-515, § 39-13-522, § 39-13-527, § 39-13-531, § 39-13-532, § 39-15-302, § 39-15-402, or § 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; . . . .

Mother points out that the trial court failed to specify which of the above subsections its was relying on in finding severe abuse in this case. And Mother notes that this Court has previously vacated a termination order when the trial court did not designate the subsections under which it found sexual abuse. *See In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *11 (Tenn. Ct. App. Nov. 16, 2015) ("Where the statute provides several possible definitions for a ground, the trial court must specify the exact definition that it relies upon in reaching its ultimate conclusion."). In reaching this result, we relied on the specific language of the termination statute requiring that trial courts make "specific findings of fact and conclusions of law" as well as precedent that failure to comply with that mandate "'affects the viability of the appeal.'" *Id.* at *11 (quoting *In re G.N.S.*, No. W2006-01437-COA-R3-PT, 2006 WL 3626322, at *6 (Tenn. Ct. App. Dec. 13, 2006)).

We have not taken the same position, however, in cases involving only dependency and neglect. Rather, in a similar case wherein the trial court failed to specify which subsection of the dependency and neglect statute it deemed applicable, we explained that

[i]nstead of remanding the case to the Circuit Court for appropriate conclusions of law based on the statutory definition of "dependent and neglected child," we deem it prudent to look at the facts as found by the Circuit Court and determine whether they amount to clear and convincing evidence that Son is a dependent and neglected child under any subsection of Tennessee Code Annotated § 37-1-102(b)(12).[12]

*In re K.A.P.*, No. W2012-00281-COA-R3-JV, 2013 WL 6665012, at *8 (Tenn. Ct. App. Dec. 17, 2013).

We conclude that the record on appeal provides a sufficient basis for us to conduct meaningful appellate review. Here, the trial court's final order expressly finds that the child was a victim of sexual abuse. In our view, this finding clearly implicates subsection (C), which provides for a finding of severe abuse when an individual is found to have committed an act prohibited by a number of our criminal statutes. These statutes uniformly involve crimes of a sexual nature. Moreover, the juvenile court's final order expressly cited this

---

[12] The definition of a dependent and neglected child has been renumbered to subsection (13) since the decision in *In re K.A.P.*

- 11 -

subsection in finding severe abuse.[13] As such, we conclude that the proper focus in this case is whether severe abuse was shown under subsection (C). Moreover, we note that there appears to be little dispute that that the child's allegations, if true, are prohibited by one or more of the statutes cited in that subsection. *See, e.g.*, Tenn. Code Ann. § 39-13-504 (involving the crime of aggravated sexual battery).[14] Rather, Mother argues that DCS presented less than clear and convincing proof that the child's claims were true.

Before addressing that issue, however, we must first consider a threshold issue raised by DCS. Specifically, DCS argues in this case that Mother lacks standing to dispute the severe abuse finding, as there was no such finding against Mother. DCS points out that both Mother and Boyfriend were parties to the juvenile court proceedings, wherein the juvenile court found only that Boyfriend had perpetrated severe abuse against the child; the juvenile court made no finding that Mother was also guilty of severe abuse. *See* Tenn. Code Ann. § 37-1-129(b)(2) (directing the trial court to determine if the parents, one parent, or another person with custody severely abused the child). The trial court came to the same conclusion in the de novo appeal of the dependency and neglect proceeding. While Mother filed a brief with this Court, Boyfriend has chosen not to do so.[15] As such, DCS contends that the severe abuse finding is final as to Boyfriend, and that Mother, who was not named a perpetrator of severe abuse, has no standing to challenge the severe abuse finding.

---

[13] Despite this notice that subsection (C) was at issue, Mother cites only subsections (A) and (B) in her appellate brief. In particular, she argues that DCS failed to present necessary evidence as to either subsection. First, she notes that there was no evidence of a likely bodily injury to the child, precluding application of subsection (A). She further argues that subsection (B) cannot be utilized because no expert proof was introduced. We agree that these subsections are inapplicable. But that does not end the inquiry as to whether DCS presented clear and convincing evidence to support application of subsection (C), as this subsection does not expressly require either expert proof or a likely bodily injury.

[14] This statute provides as follows:

> (a) Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
> (2) The defendant causes bodily injury to the victim;
> (3) The defendant is aided or abetted by one (1) or more other persons; and
> (A) Force or coercion is used to accomplish the act; or
> (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or
> (4) The victim is less than thirteen (13) years of age.
> (b) Aggravated sexual battery is a Class B felony.

Tenn. Code Ann. § 39-13-504.

[15] It does not appear that Boyfriend was represented by counsel in either the juvenile court or trial court proceedings.

- 12 -

We have some concerns that DCS has waived this argument. Importantly, DCS failed to designate this argument as an issue on appeal. Arguments not designated as issues on appeal are generally waived in this Court. *See* ***State v. Freeman***, 402 S.W.3d 643, 653 (Tenn. Ct. App. Oct. 16, 2012) ("Generally, an issue argued in the body of the brief, but not designated as an issue will be considered waived"); ***State v. Deberry***, No. W2004-00018-CCA-R3-CD, 2004 WL 2808908, at *6 (Tenn. Crim. App. Dec. 7, 2004) ("Because, however, the state failed to raise the issue of standing in the trial court, it is our view that the issue is waived on appeal."). *But see* ***In re Joseph F.***, 492 S.W.3d 690, 696 (Tenn. Ct. App. 2016) (holding that the question of who may bring a termination petition is an issue of statutory standing that cannot be waived).

In any event, we cannot conclude that Mother lacks standing to dispute this finding. It is true that while Boyfriend was a party to the juvenile court proceedings, he filed no notice of appeal of the juvenile court's judgment. But the law clearly provides that Boyfriend was a party to the de novo hearing in circuit court. *See* Tenn. R. Prac. & Proc. 118(i) ("All parties to the juvenile court proceeding shall be parties to the *de novo* hearing."); *see also* Tenn. R. Prac. & Proc. 1(b) (stating that the Tennessee Rules of Juvenile Practice and Procedure "apply to . . . dependent and neglect proceedings").

Still, Boyfriend has chosen not to file a brief in this appeal, and "[a]s a general rule, . . . a party lacks standing to appeal an order entered against a co-party who has elected not to appeal that order." ***Clark v. Perry***, No. 02A01-9704-CH-00080, 1998 WL 34190562, at *7 (Tenn. Ct. App. Mar. 19, 1998). We must conclude, however, that the unique circumstances of this case demonstrate Mother's standing.

> As we have explained,
> Under our case law only an aggrieved party has a right to prosecute an appeal. An aggrieved party has been defined as one having an interest recognized by law which is injuriously affected by the judgment, or whose property rights or personal interest are directly affected by its operation[.] Under this test, Southern Fire of course would not be aggrieved unless, as has already been noted, it would be bound by the Court's finding of fact . . . .

***Koontz v. Epperson Elec. Co.***, 643 S.W.2d 333, 335 (Tenn. Ct. App. 1982) (citations omitted). There can be no dispute that a dependency and neglect and/or severe abuse action directly affects Mother's fundamental liberty interest in the care and custody of her child. *See* ***Troxel***, 530 U.S. at 65. Although Mother was not named the perpetrator of the severe abuse by the trial court, the trial court maintained custody of the child with DCS, in large part based on the severe abuse finding. And the trial court specifically adopted the juvenile court's disposition, which provided that Mother was not to allow any contact whatsoever between Boyfriend and the child, on pain of possible criminal charges. This order clearly interferes with Mother's right to have custody and control over her own child. Thus, while

she has not been named a perpetrator of severe abuse, we cannot conclude that she was not aggrieved by the severe abuse finding.

In a somewhat similar case, this Court concluded that a parent had standing to contest a decision, the result of which interfered with the parent's liberty interest. *See Matter of McBee*, No. 88-129-II, 1988 WL 87699, at *1 (Tenn. Ct. App. Aug. 24, 1988). In *Matter of McBee*, the State filed a petition to declare the child dependent and neglected. *Id.* at *1. The child's biological father, who did not have custody of the child at the time that the State filed the petition, was served, and thereafter filed a petition for custody of the child. After the juvenile court denied his petition, the father appealed. The circuit court dismissed the father's petition in part because he did not have standing to contest the dependency and neglect order, because the child had not been removed from his custody. We reversed, holding that while the father did not have "legal custody" of the child at the time the petition was filed, he was still aggrieved by the order placing the child in State custody, because the order interfered with his protected liberty interest in the care and custody of his child. *Id.*

More recently, we likewise rejected an argument that a parent did not have standing to pursue an appeal in the dependency and neglect context. *See In re Courtney R.*, No. M2015-01024-COA-R3-JV, 2017 WL 1548241 (Tenn. Ct. App. Apr. 28, 2017). In *In re Courtney*, DCS removed a child from a mother's custody and placed her with foster parents. *Id.* at *1. The child's guardian ad litem then filed a dependency and neglect petition in the juvenile court. *Id.* The biological father participated in developing a permanency plan, and DCS sought to provisionally place the child with him. *Id.* After the parties waived the adjudicatory hearing, the juvenile court ruled that custody would remain with DCS. *Id.* at *1, 2. Only the father appealed the juvenile court judgment to circuit court, which reversed and ordered that custody would be placed with the father. *Id.* at *2–3.

The mother then appealed the judgment of the circuit court to this Court. *Id.* at *3. On appeal, the guardian ad litem argued that we lacked subject matter jurisdiction over the mother's claims and that she lacked standing. *Id.* We rejected both arguments. First, we held that even though Mother did not perfect an appeal of the juvenile court judgment, she was not required to do so in order to appeal to this Court. *Id.* at *4. We further rejected the guardian ad litem's argument that the mother lacked standing, holding that the mother "clearly possesses an interest recognized by law that was affected by the circuit court's order" because the action affected her "fundamental right, based in both federal and state constitutions, to the care, custody, and control of his or her own child." *Id.*

Like the parents in *Matter of McBee* and *In re Courtney*, Mother has a fundamental right to the care and custody of her own child. The severe abuse finding interferes with that right, regardless of whether she was found to be the perpetrator of that abuse. Stated another way, Mother has standing to contest the severe abuse finding. As DCS points out, in order to establish standing, Mother must show: (1) an injury which is distinct and palpable; (2) a

causal connection between that injury and the conduct of which she complains; and (3) the likelihood that a favorable decision will redress that injury. *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 767 (Tenn. Ct. App. 2002) (citations omitted). Here, although Mother was not found to have been a perpetrator of severe abuse, the severe abuse finding against Boyfriend has significant ramifications for her. Specifically, the severe abuse finding prevents Boyfriend and the child from having any contact with each other, much less residing together. *See also* Tenn. Code Ann. § 37-1-130(c) (discussed, *supra*). Thus, the most significant barrier to reunification of the child with Mother is her continued relationship with Boyfriend. In fact, the DCS family services worker testified that Mother had completed all other tasks required of her by the permanency plan, and the only barrier standing in the way of Mother's full compliance was her continued contact with Boyfriend. Mother, however, shares a child with Boyfriend, lives with him, and relies on him for support. As such, the severe abuse finding has significant ramifications with respect to how Mother is able to live her life. The finding essentially forces Mother to choose between the child and Boyfriend. As such, she has a palpable injury, there is a causal connection between the injury and the severe abuse finding, and a reversal of the severe abuse finding is likely to redress that injury. She therefore has standing to appeal that finding.

We next turn to consider whether clear and convincing proof exists to support a finding that the child was a victim of severe abuse under section 37-1-102(b)(27)(C). The evidence in this case to support the severe abuse finding consists largely of disclosures the child made to various individuals in the fall of 2018. There is no evidence that there was a witness to the abuse and no physical evidence was presented to substantiate the allegations. Of course, this Court has previously held that a child's disclosures of sexual abuse "are not rendered untrustworthy simply because there was no eyewitness to the abuse, and no physical evidence to confirm that it occurred." *In re Madison M.*, No. M2013-02561-COA-R3-JV, 2014 WL 4792793, at *14 (Tenn. Ct. App. Sept. 25, 2014); *see also In re Azhianne G.*, No. E2020-00530-COA-R3-JV, 2021 WL 1038208, at *9 (Tenn. Ct. App. Mar. 18, 2021) (citing *In re Madison*, 2014 WL 4792793, at *14)). In such a situation, the issue of whether the child's statements are trustworthy is for the trial judge to decide. *Id.*[16]

Here, the trial court's finding of severe abuse largely rested on its assessment of witness credibility. A DCS investigator and two of the child's former teachers testified about the disclosures made to them, while Mother and Boyfriend testified that the alleged

---

[16] In *Madison*, the issue considered by the court was whether the child's out-of-court statements should be admitted into evidence under rule 803(25) of the Tennessee Rules of Evidence, which allows certain out-of-court statements regarding abuse by children to be admitted, "[p]rovided that the circumstances indicate trustworthiness[.]" As DCS points out in its brief, Mother did not object to the admissibility of these statements at trial. As such, the admissibility of the child's statements is not at issue in this appeal. But the fact that the statements were admissible does not, ipso facto, address the question of whether they provided the necessary clear and convincing proof of severe abuse. As such, the credibility and trustworthiness of the child's statements are relevant to this appeal despite the fact that questions of admissibility were not properly raised.

abuse did not occur. The trial court's determination of the credibility of each of these witnesses is entitled to great weight on appeal. *See **In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011) ("Findings of fact based on witness credibility are given great deference and will not be disturbed absent clear evidence to the contrary."); ***In re Melanie T.***, 352 S.W.3d 687, 702 (Tenn. Ct. App. 2011) ("When the trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference is accorded to the trial court's factual findings."). Nothing in the record indicates that the trial court erred in assessing the credibility of the witnesses that were present before it. Indeed, there is no dispute that the child did indeed make these disclosures to the DCS investigator, the forensic interviewer, and two teachers. Moreover, there is no real dispute that the child was suffering from irritation in her private area on the date that she made the initial disclosure. The central question in this case, however, is whether the child's disclosures that indicated that this discomfort was due to abusive conduct by Boyfriend are trustworthy. Moreover, because these disclosures make up essentially the sole proof to show that Boyfriend committed severe abuse, we must evaluate the disclosures to determine whether they provide clear and convincing evidence to support the severe abuse finding.

Importantly, the trial court did not hear proof directly from the child, but only heard the child's disclosures through the statements of others and the video-recorded forensic interview. In this situation, the trial court cannot "insulate [its] findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness." ***Anderson v. City of Bessemer City, N.C.***, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512, 84 L. Ed. 2d 518 (1985). "Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id.* Indeed, "appellate courts are not required to give [] deference to a trial court's findings of fact based on documentary evidence such as depositions, transcripts, or *video recordings*." ***Kelly v. Kelly***, 445 S.W.3d 685, 693 (Tenn. 2014) (emphasis added) (citing ***Mitchell v. Fayetteville Pub. Utils.***, 368 S.W.3d 442, 448 (Tenn. 2012)). As our supreme court explained:

> When findings are based on documentary evidence, an appellate court's ability to assess credibility and to weigh the evidence is the same as the trial court's. Accordingly, when factual findings are based on documentary evidence, an appellate court may draw its own conclusions with regard to the weight and credibility to be afforded that documentary evidence.

*Id.* (citations omitted).

Respectfully, the trial court's finding that the child's statements were "consistent" is undermined by our de novo review of the forensic interview video, which reveals multiple "internal[] inconsisten[cies]" in the child's disclosures. ***Anderson***, 470 U.S. at

575. While it is true that the child made similar disclosures to her teachers and the DCS investigator, her disclosures during the forensic interview were numerous and varied. For example, although the child initially stated that Boyfriend had used hand sanitizer on her private area, she later amended this statement to state that he also used hot sauce on this area as well. Upon being asked what the hand sanitizer looked like, the child said it was blue. Later, when the forensic interviewer asked her if the hand sanitizer was blue, she said it was green. The child also mentioned that Boyfriend used or threatened to use hot sauce on her eyes to the DCS investigator and her former teacher. DCS argues that the child's repeated statements to various people regarding the hand sanitizer incident lend that allegation an indicium of reliability. We would expect, then, that DCS would assign similar credence to the child's spontaneous allegations concerning the use of hot sauce on her body, which allegations were likewise repeated to multiple individuals. *Cf.* ***In re Melanie T.***, 352 S.W.3d at 702 (noting that consistent statements made over a period of time to different people "may constitute clear and convincing evidence" of sexual abuse, especially when coupled with other evidence) (discussed in detail, *infra*). DCS, however, does not seem to take these allegations concerning the hot sauce seriously—while hand sanitizer is mentioned fourteen times in DCS's brief, hot sauce is mentioned only once and, even then, only in the context of the child's initial statement to the investigator that Boyfriend threatened to put hot sauce in her eyes. DCS's choice to omit these allegations from its brief suggests their position that the child's allegation that Boyfriend put hot sauce on her private area had so little credibility or veracity as to not bear mentioning.

Moreover, this was not the only mention of hot sauce by the child. Instead, her other remarks about hot sauce illuminate additional inconstancies in her disclosures. For example, when asked whether Mother was aware of the alleged abuse and what her reaction was, the child gave three different answers: (1) that Mother slept through the abuse; (2) that Mother awoke and learned of the abuse, but did not care; and (3) that Mother awoke and learned of the abuse, and then "ground" Boyfriend and put hot sauce in his eyes. Despite the child stating that Mother was aware of the abuse in some of her statements, DCS does not argue in this case that Mother committed severe abuse by knowingly failing to protect the child from Boyfriend's alleged abuse. Indeed, DCS goes so far as to argue that Mother cannot contest the severe abuse finding because it was not relevant to her. As such, DCS again appears to discount some of the child's statements, while relying heavily on others.

The child's explanation of how often the alleged abuse occurred was also not consistent. First, the child indicated that the alleged abuse occurred only a single time at night. The child later stated that Boyfriend had poured both hand sanitizer and hot sauce in her private area "Friday, Saturday, Sunday," and also "100 days" and "100 times."

Moreover, the sexual abuse allegations were not the only allegations made by the child in the forensic interview. The child alleged that her former teachers were going to jail in part because they kicked her. And the child alleged that Boyfriend had not only killed

eighteen cats and stomped on her stomach, but had killed and dismembered their neighbor before burying him in the yard. DCS again declines to discuss these allegations in its brief, suggesting its position that these allegations should not be given weight in determining whether Boyfriend committed severe abuse against the child. DCS's witnesses also did not fully reckon with these inconsistencies, stating that they could not remember the child's varied allegations or that the child could have been telling the truth in all instances depending on the circumstances.

DCS does not cite a single case wherein we have affirmed a finding of severe abuse under similar circumstances.[17] Our own review of the caselaw shows a multitude of cases that have affirmed severe abuse findings without witnesses or physical evidence, but these cases are not analogous to the case-at-bar. For example, in *In re Madison M.*, No. M2013-02561-COA-R3-JV, 2014 WL 4792793 (Tenn. Ct. App. Sept. 25, 2014), the child disclosed to her teacher that her stepfather had touched her private area. *Id.* at *10. The child's teacher testified that the child touched her private area daily at school and that she believed that the child knew the difference between truth and "non-truth." The child's school counselor confirmed that the child complained that her private area hurt on several occasions. The child later repeated these allegations during a forensic interview. The child was generally consistent that her stepfather was the perpetrator, but once named her three-year-old brother. A former preschool teacher testified that the child never had issues with lying. Finally, a licensed clinical psychologist testified that the child made the same allegations consistently against stepfather during their sessions, that the child could demonstrate the abuse, and that her behavior when discussing the abuse was avoidant, which was "congruent with the allegations of sexual abuse." *Id.* The psychologist also opined that the child's statements were credible, despite sometimes not answering objective questions truthfully, due to the consistency of the allegations over three sessions, –as made verbally, acted out, and in drawings.

On appeal, the stepfather argued that the child could not distinguish between the truth and a lie. *Id.* at *13. He therefore asserted that the trial court should not have admitted her statements under Rule 803(25) of the Tennessee Rules of Evidence. Although we conceded that the child had difficulty distinguishing between truths and lies and had once alleged that her three-year old brother was the perpetrator of the abuse, we concluded that "the overall circumstances present in this case indicate trustworthiness[.]" *Id.* In support, we noted that although there were "slight variances" in the child's disclosures, the child was generally consistent in her allegations against stepfather and was "unmistakably clear in communicating the details of the abuse to several people." *Id.* We also noted that no evidence was presented of a motive for the child to be untruthful. Moreover, the child's teacher, guidance counselor, and psychologist testified that they believed the allegations. Based on the child's statements and the other testimony presented, we affirmed the trial court's finding that there was clear and convincing evidence of severe abuse. *Id.* at *14.

---

[17] Nor does DCS cite a single case that is factually similar.

We came to the same conclusion in *In re Azhianne G.*, No. E2020-00530-COA-R3-JV, 2021 WL 1038208, at *1 (Tenn. Ct. App. Mar. 18, 2021). In that case, a four-year-old child made spontaneous disclosures of sexual abuse to both a forensic interviewer and a treating therapist. *Id.* at *2. Indeed, the evidence showed that during both the forensic interview and later therapy sessions, the child was able to specifically and graphically describe the sexual abuse in detail, both by reenacting the abuse and using anatomical language that was beyond a typical four-year-old's vocabulary. *Id.* at *5. At all times, the child named the mother as the sole perpetrator. *Id.* at *5–6. As such, both the forensic interviewer and the therapist testified that the child's allegations were credible. The evidence further showed that the child had severe behavioral issues, including aggression, sexualized behavior, and violence to others and animals. *Id.* at *2. Indeed, the child stated a desire to engage in sexual acts with both his therapist and the forensic interviewer and was disappointed by their refusal. *Id.* at *6. Under these circumstances, we held that the child's statements were trustworthy under Rule 803(25). *Id.* at *6. We further held that "the [c]hild's age at the time and the consistency and spontaneity of his disclosures of abuse, coupled with his obvious knowledge of terms and feelings associated with sexual acts and body parts and his unwavering identification of [m]other as the perpetrator" provided clear and convincing proof to establish severe abuse. *Id.* at *8.

The same is true of *In re Melanie T.* In that case, the trial court found that the children were the victims of severe abuse based on numerous disclosures the children made of the abuse to counselors, doctors, and teachers. 352 S.W.3d at 700. The evidence showed that the two children made similar, but independent disclosures of the abuse in graphic terms, sometimes with drawings. *Id.* at 701. Indeed, the children both engaged in sexual behavior and had sexual knowledge not typical of their age. Moreover, an expert testified that the children suffer from issues that are typical in victims of child sexual abuse and testified, to a reasonable degree of medical certainty, that at least one of the children had suffered sexual abuse at the hands of their stepfather. Finally, even the children's mother admitted that she witnessed the stepfather abuse the children, albeit in a non-sexual manner. *Id.*

On appeal, the stepfather argued that the severe abuse finding was not supported by clear and convincing evidence. We ultimately disagreed, explaining:

> Our courts recognize that statements by a young child, made over a period of time to different people under circumstances and in situations that were not unduly suggestive or directive regarding sexual abuse by an adult, may constitute clear and convincing evidence that the child was sexually abused, especially when coupled with the exhibition of sexualized behavior and the development of psychological and emotional problems, as was present in this case.

- 19 -

*Id.* (citing *In re S.M.C. & J.L.C.*, No. 01A01-9807-JV-00358, 1999 WL 378742, at \*4 (Tenn. Ct. App. June 11, 1999)).

In another case, the father attempted to undermine the child's credibility and therefore the evidence of abuse by pointing out that the child "once made manifestly false allegations that Father broke into their house." *In re: M.D.*, No. M2015-01023-COA-R3-JV, 2016 WL 5723954, at \*4 (Tenn. Ct. App. Sept. 30, 2016). We rejected the father's argument, however, by holding that "a child's making a false allegation in one separate instance" does not necessarily "negate a body of consistent allegations of sexual abuse." *Id.*

In this case, the child did make spontaneous disclosures that Boyfriend used foreign substances on her private area to multiple individuals. These disclosures unequivocally named Boyfriend as the perpetrator. These facts certainly lend credence to the allegations of severe abuse. *See In re Azhianne G.*, 2021 WL 1038208, at \*8 (noting as support for the severe abuse finding that the child was "unwavering" in his identification of mother as the perpetrator of the abuse); *In re Melanie T.*, 352 S.W.3d at 702 (noting that consistent disclosures over a period of time to different people, coupled with other evidence, may constitute clear and convincing evidence of abuse). Still, the child also said that Boyfriend did not hurt her and that no one touched her. Furthermore, none of the above cases involve the type and frequency of inconsistencies as to other details of the alleged abuse that are present here. Here, the child was not consistent in detailing the instrumentality of the abuse—be it hand sanitizer or hot sauce; the frequency of the abuse—from one instance to "100 days"; or whether her mother had knowledge of the abuse—which ranged from not knowing to not caring to punishing Boyfriend.

The child's other allegations against Boyfriend also give us pause. According to the child, Boyfriend not only killed eighteen cats and stomped on her stomach, he murdered and dismembered a neighbor before burying him in the yard, for which the police arrested him. Other than the child's statements, there was no proof whatsoever to substantiate these claims. The child's allegations were not limited, however, to Boyfriend, as she also alleged physical abuse by her former teachers. Importantly, DCS ignores these allegations in its brief. Under these circumstances, we can only conclude that DCS wants this Court to believe the child's allegation concerning hand sanitizer, while ignoring all of the other troubling and sometimes fanciful allegations made by the child.

Moreover, there was no expert medical or psychological proof of any kind submitted to substantiate the child's allegations in this case. *But see In re Madison M.*, 2014 WL 4792793, at \*14 (noting that physical proof is not always necessary). Importantly, unlike some of the above cases, there was no expert testimony in this case that the child was able to distinguish between truth and untruth. *See, e.g.*, *In re Azhianne G.*, 2021 WL 1038208, at \*1. While the child's former teachers and the DCS investigator testified that they believed the child about the hand sanitizer allegation, they often deflected when questioned

about the child's other allegations. The forensic interviewer did not testify or offer any expert opinion about the truth of the child's allegations or her veracity. As such, it is rank speculation to suggest that due to the length of the interview or other circumstances, the child's initial statements are to be given weight, while the other allegations that she makes throughout the entirety of the interview are to be discarded.[18] And the child did not make any disclosures of abuse to Dr. Saunders that he could evaluate for their veracity. The omission of proof as to the child's ability to distinguish between truth and untruth is especially relevant in this case because the evidence was undisputed that the child had been diagnosed with developmental delays that affect her behavior; even the DCS investigator conceded that it would not be unusual for a child in that situation to make up stories and that the child at issue indeed had a "propensity" to do so, as she often had difficulty distinguishing between the truth and facts created by her imagination. In light of the omission of this evidence coupled with the other incredible allegations in the forensic interview, we must conclude that substantial doubts about the child's ability to understand the difference between truth and untruth exist in this case.

This case is distinguishable from the above cases in other ways. First, there was not expert testimony that the child was behaving in a way or suffering from issues that were typical of children who were the victims of sexual abuse. *See In re Madison M.*, 2014 WL 4792793, at *10 (relying in part on testimony that the child's behavior was consistent with having experienced sexual abuse); *In re Melanie T.*, 352 S.W.3d at 702 (relying in part on testimony by an expert that the children suffered from disorders that were typical of victims of child sexual abuse and also exhibited sexual behaviors). Ms. Urvan in fact testified to the opposite—that she had not observed any sexually reactive behaviors of any kind in her time with the child.[19] Nor did the evidence show that the child has sexual knowledge inappropriate for her age. *See id.* Indeed, unlike the child in *In re Azhianne*¸ who used graphic language far beyond what was age-appropriate, the child here did not utilize such language; when asked to name her private area on a drawing, the child consistently stated that this area was the "intestines." *In re Azhianne*, 2021 WL 1038208, at *6.

Returning a child to home where there is even a possibility of sexual abuse is not a situation that this Court takes lightly. But Tennessee law provides that we exercise the same

---

[18] To be sure, DCS offers no evidence and makes no argument that the length of the interview—approximately one and-a-half hours, including an extended break, which the forensic interviewer apparently determined was an appropriate length of time—contributed to or in any way caused the child's inconsistent and exaggerated statements.

[19] Like Dr. Saunders, Ms. Urvan also testified that the child made no disclosures of past abuse to her. Although Ms. Urvan testified that it was "possible" that the child would not remember these events months later, the child did tell Ms. Urvan, unprompted and multiple times, that Boyfriend did "nothing" to her and that she was merely "playing jokes on her teacher." Thus, Ms. Urvan's own testimony undermines her opinion that the child possibly could not remember the events of 2018. Moreover, Ms. Urvan's testimony does not indicate her role at the King's Daughters' School or her education; as such, it is entirely unclear what weight should be given to this rather unsupported opinion.

caution in removing a child from her parents without sufficient proof to substantiate the allegations made against them, as the law requires clear and convincing evidence to substantiate severe abuse. *See In re H.L.F.*, 297 S.W.3d at 233. As this Court has previously explained concerning the clear and convincing evidence standard:

> "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re A.T.P.*, No. M2006-02697-COA-R3-CV, 2008 WL 115538, at *4, 2008 Tenn. App. LEXIS 10 (Tenn. Ct. App. Jan. 10, 2008) (citing *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9, 2003 Tenn. App. LEXIS 569 (Tenn. Ct. App. Aug. 13, 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re A.T.P.*, 2008 WL 115538, at *4, 2008 Tenn. App. LEXIS 10 (citing *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)). *See also In re Samaria S.*, 347 S.W.3d [188,] 200 [(Tenn. Ct. App. 2011)].

*In re S.J.*, 387 S.W.3d 576, 586–87 (Tenn. Ct. App. 2012).

Despite our reluctance to overturn the decision of the trial court given the serious nature of the allegations at issue, we must conclude that clear and convincing evidence was not presented to support the allegation of severe abuse. Here, the claim of severe abuse rests nearly exclusively on disclosures made by the child to third parties. The trial court found the testimony of various witnesses to whom these disclosures had been made credible. Nothing in the record suggests that the trial court was in error in accepting this testimony. The issue in this case is not whether the child made these disclosures, but whether the disclosures produce a firm conviction of the truth of the allegations. *See In re S.J.*, 387 S.W.3d at 586 (citing *In re A.T.P.*, 2008 WL 115538, at *4). And here the disclosures themselves are suspect, riddled as they are with inconsistencies, exaggerations, and obvious fabrications that DCS chooses to ignore rather than address. Thus, this is not the case where a child's consistent allegations are rebutted by only a single instance of a false allegation. *See In re: M.D.*, 2016 WL 5723954, at *4.

We concede that some facts in this case do lend support to DCS's theory. Despite the absence of any physical proof, there is no real dispute that the child was suffering from irritation in her private area. Unlike any of the cases cited above, however, the proof shows

that this irritation could possibly be explained by the child's diagnosis of pinworms around this time period. Still, the child often named Boyfriend as the perpetrator, except in those repeated instances in which she claimed that he had done nothing untoward to her. We are also troubled by Mother's decision to remove the child from school on the same day that she was interviewed concerning these allegations, although we cannot say with certainty that the removal was a result of the DCS investigation. Likewise, the proof shows that Mother resisted taking the child for the forensic interview; Mother testified without apparent dispute, however, that she wanted to retain an attorney before the interview took place. Given the very serious allegations that were being levied against her, we cannot say that Mother's instinct to seek legal advice was entirely unreasonable.[20] There was also no evidence presented other than vague insinuations that the child was angry at Boyfriend to suggest a motive for her allegations. But the forensic interview demonstrates that the child indeed made other outlandish and untrue allegations against Boyfriend and other individuals. Given that the child made a multitude of allegations against Boyfriend that DCS does not appear to contend are credible and the child's disclosures make up the bulk of the dispositive evidence in this case, we must conclude that the evidence presented in this case simply fails to "'eliminate[] any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re S.J.*, 387 S.W.3d at 586 (quoting *In re A.T.P.*, 2008 WL 115538, at *4). The trial court's finding that the child was a victim of severe abuse committed by Boyfriend is therefore reversed.

### B.     Educational Neglect

Mother next contends that the trial court erred in finding educational neglect at the time of the de novo hearing. In contrast, DCS contends that the trial court correctly found that the child was dependent and neglected at the time of the de novo hearing under Tennessee Code Annotated section 37-1-102(b)(13(C), which defines a dependent and neglected child as one "[w]ho is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school[.]"

Here, there is no dispute that Mother voluntarily chose to remove the child from public school on the morning of October 19, 2018. According to Mother, she decided to remove the child in favor of home-schooling because she was dissatisfied with the instruction that the child was receiving, in that the school wanted the child to attend only half-days. By March 2019, however, a DCS home visit revealed that Mother was not residing with the child full-time and that step-grandfather was teaching the child solely through the use of a deck of playing cards. As a result, DCS filed an amended petition for dependency and neglect to allege educational neglect.

---

[20] Mother did retain an attorney very early in these proceedings, despite the fact that she was later declared indigent in this appeal.

Mother of course disputes that the child was ever educationally neglected, even in March 2019. But her central argument in this appeal is that, regardless of the circumstances that existed in March 2019, the child was not suffering from educational neglect as of the date of the de novo hearing in the trial court on January 30, 2020. Rather, at that time, the child was enrolled in the King's Daughters' School. Moreover, Mother testified at the de novo hearing that should the child be returned to her custody, she would enroll the child in the local public school. Thus, Mother contends that there was no evidence that educational neglect existed as of the date of the de novo hearing.

It is well-settled that "the circumstances leading to a finding of dependency and neglect must exist at the time of the *de novo* hearing." *In re Caleb L.C.*, 362 S.W.3d 581, 599 (Tenn. Ct. App. 2011) (citing *Green v. Green*, M2007-01263-COA-R3-CV, 2009 WL 348289, at *10 n.13 (Tenn. Ct. App. 2009)). Thus, while the circuit court may consider the record that was created in the juvenile court proceedings, the circuit court may not rely solely on the record made before the juvenile court. *Green*, 2009 WL 348289, at *7. Instead, the circuit court must try the matter "as if no other trial had occurred." *Id.* (citing *Ware v. Meharry Medical College*, 898 S.W.2d 181, 184 (Tenn. 1995)). "Since the purpose of a dependency and neglect proceeding is to protect the welfare of the child, a court should hear evidence of the present situation so that it can ma[k]e a decision, including custody if appropriate, based on the child's best interest at the time of the decision." *Id.* at *10 n.13.

In practice, this rule means that while a child may have been properly adjudicated as dependent and neglected at the time of the juvenile court hearing, if circumstances have changed so that the child is no longer dependent and neglected at the time of the de novo circuit court hearing, the dependency and neglect petition must be dismissed. *See In re Landon H.*, No. M2014-01608-COA-R3-JV, 2016 WL 762741, at *6 (Tenn. Ct. App. Feb. 25, 2016) (citing *Green*, 2009 WL 348289, at *4) ("If the conditions of dependency and neglect do not exist at the time of the hearing, the circuit court must dismiss the petition."). For example, in *Green v. Green*, the juvenile court found the children dependent and neglected because the mother was living with a registered sex offender. By the time of the de novo trial in circuit court, however, Mother no longer lived with him and had in fact divorced him. As such, we affirmed the circuit court's refusal to find dependency and neglect because the mother "removed the circumstances that created the dependency and neglect." *Green*, 2009 WL 348289, at *10.

In another case, we found that evidence of Mother's prior drug use was not sufficient to sustain a finding that the child was dependent and neglected at the de novo circuit court hearing. *See In re K.A.P.*, No. W2012-00281-COA-R3-JV, 2013 WL 6665012 (Tenn. Ct. App. Dec. 17, 2013). As we explained, the dependency and neglect statute "does not permit a court to hold that any bad behavior whatsoever by a parent must inevitably lead to a finding that the child is dependent and neglected." *Id.* at *7. Moreover, we held that "the fact that [m]other at some point in the past engaged in once-per-week marijuana use and

- 24 -

had a single positive drug test in September 2011, without more, does not amount to clear and convincing evidence that [m]other is 'unfit to properly care for [son]' or that [s]on is dependent and neglected" as of the December 2011 de novo trial. *Id.* at *8. In another case, we affirmed the trial court's dismissal of a dependency and neglect petition when the evidence showed that Mother was no longer transient, unemployed, using illegal drugs, or without transportation at the time of the de novo hearing. *See In re Alysia M.S.*, No. M2011-02008-COA-R3-JV, 2013 WL 1501710, at *8 (Tenn. Ct. App. Apr. 11, 2013).

But in *In re Nehemiah H.*, No. M2019-01167-COA-R3-JV, 2020 WL 3885956 (Tenn. Ct. App. July 8, 2020), we came to the opposite conclusion. *Id.* at *8. In that case, the children were removed from the parents' home and placed with relatives by the time of the de novo hearing. Nevertheless, we held that the children were still dependent and neglected where the parents did not recognize the role they had played in the children's trauma and the children expressed fear of returning to them. *Id.* Similarly, in *In re Crystal W.*, No. E2020-00617-COA-R3-JV, 2021 WL 214823 (Tenn. Ct. App. Jan. 21, 2021), we held that the circuit court did not err in finding the child dependent and neglected. *Id.* at *10. In that case, the evidence demonstrated that the mother's living situation and mental health had improved somewhat during the period between the juvenile court proceedings and the de novo trial, but the mother had no concrete plan for caring for the children upon their return and the mother continued to disagree that she was in need of mental health treatment. *Id.*

DCS does not dispute that the circumstances of the child must be judged at the time of the de novo hearing. But DCS argues that *Green* and its progeny have created a "Catch-22" in which a parent may have a child returned to his or her care when DCS has removed the child and thereby eliminated the condition that led to the dependency and neglect finding. Instead, DCS urges this Court to adopt an interpretation of our dependency and neglect framework wherein a child *is* dependent and neglected when the proof shows that she *has sustained* abuse or neglect in the past.

In support of this argument, DCS asks us to look at the very definition of a dependent and neglected child found in Tennessee Code Annotated section 37-1-102(b)(13)(G), which it asserts defines a dependent and neglected child as one "[w]ho is suffering from abuse." DCS then directs us to consider the statute's definition of abuse, which may be found when a child "is suffering from, *has sustained*, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker[.]" Tenn. Code Ann. § 37-1-102(b)(1) (emphasis added). Thus, DCS argues that the child may be found to be currently dependent and neglected because she previously sustained educational neglect.

This issue requires that we interpret a statute, and we are therefore guided by our familiar rules of statutory construction. Thus, in interpreting section 37-1-102, "[o]ur role

is to determine legislative intent and to effectuate legislative purpose." *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010); *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009)). "The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Id.* (citing *Lee Med., Inc.*, 312 S.W.3d at 526; *Hayes v. Gibson Cnty.*, 288 S.W.3d 334, 337 (Tenn. 2009)). If we determine that the language of the statute is clear and unambiguous, we look no farther to ascertain the statute's meaning. *Id.* (citing *Lee Med., Inc.*, 312 S.W.3d at 527; *Green v. Green*, 293 S.W.3d 493, 507 (Tenn. 2009).

Respectfully, we conclude that the plain language of section 37-1-102 belies DCS's assertions. Importantly, despite DCS's assertion otherwise, a dependent and neglected child is not only one that is suffering from abuse, but also one that is suffering from neglect. *See* Tenn. Code Ann. § 37-1-102(b)(13)(G) (defining a dependent and neglected child as one "[w]ho is suffering from abuse *or neglect*") (emphasis added). And here, DCS has not alleged that Mother's alleged failure to educate the child rises to the level of abuse required by section 37-1-102(b)(1). Instead, as previously discussed, DCS asserts that its allegations against Mother fall under section 37-1-102(b)(13)(C), which provides that a child is dependent and neglected if he or she "is under unlawful or improper care, supervision, custody, or restraint" or "is unlawfully kept out of school."

Importantly, the definition of a dependent and neglected child cited by DCS contains a different verb tense than the definition actually at issue in this case. *Cf. Nationwide Mut. Fire Ins. Co. v. Memphis Light, Gas & Water*, 578 S.W.3d 26, 35 (Tenn. Ct. App. 2018) ("[I]n construing statutes, we must consider the grammar employed by the legislature.") (citing *Hawkins v. Case Mgmt. Inc.*, 165 S.W.3d 296, 300 (Tenn. Ct. App. 2004) ("In addition to being bound by the plain language of the statute, this Court is also bound by the general rules of grammatical construction.")). *But see Tennessee Manufactured Hous. Ass'n v. Metro. Gov't of Nashville*, 798 S.W.2d 254, 257 (Tenn. Ct. App. 1990) (citing *Tidwell v. Collins*, 522 S.W.2d 674, 676 (Tenn. 1975)) ("However, the courts should not base their construction of statutes solely on the technical rules of grammar and punctuation."). Here, subsection (b)(1) contains verbs in forms of the past, present, and future tenses to ensure that victims of abuse may be protected through dependency and neglect proceedings. *See* Tenn. Code Ann. § 37-1-102(b)(1) (requiring variously that the child "is suffering from, has sustained, or may be in immediate danger of suffering" abuse). In particular, the portion of the subsection relied upon by DCS, that the child "has sustained" abuse, uses the present perfect tense, which is "a tense indicating an action as completed or a state as having ended at the time of speaking, but not in any definite time in the past [] (Ex. has gone)." *Webster's New World College Dictionary* 1152 (5th ed. 2014). Thus, the use of the verb *has sustained* therefore "indicates that the legislature intended for the court to consider conduct that occurred in the past up to and including the present." *In re Sheneal W. Jr.*, 45 Conn. Supp. 586, 595, 728 A.2d 544, 550 (Conn. Super. Ct. 1999). This makes logical sense, as a parent cannot erase specific acts of brutality and

the consequences that flow therefrom by simply refraining from continuing the abuse, particularly when a factor in the cessation of the abuse is DCS's involvement. Instead, as this Court recently explained, "the fact of [the child's] egregious injuries remains a constant," even after the parent has made positive changes in his or her life. *In re Treylynn T.*, No. W2019-01585-COA-R3-JV, 2020 WL 5416649, at \*8 (Tenn. Ct. App. Sept. 9, 2020), *appeal granted, cause remanded on other grounds*, (Tenn. Dec. 16, 2020).

The Tennessee General Assembly, however, did not choose to utilize the present perfect tense in the definition of a dependent and neglected child that is at issue now. Rather, subsection (b)(13)(C) uses the present tense in that it applies to a child who *is* under improper care or control or who *is* kept out of school unlawfully. We note that while the past tense form of the word "to keep" is used in the definition, it is coupled with the present tense of the verb "to be." Under these circumstances, we believe that the phrase "kept out of school" constitutes a past participle phrase that does not denote past action. *See, e.g.*, *VanGessel v. Lakewood Pub. Sch.*, 220 Mich. App. 37, 43, 558 N.W.2d 248, 251 (1996) (explaining that "'is employed' is a past participle"). As other courts have explained, "'[a] past participle is simply the form of the verb used in the phrase and does not suggest past action.'" *In re Roberts*, 431 B.R. 914, 917 (Bankr. S.D. Ind. 2010) (quoting *In re Taylor*, 388 B.R. 115, 119 (Bankr. M.D. Pa. 2008)). "For example, the United States Supreme Court has stated that past participles 'describe the present state of a thing,' just the way 'adjectives [ ] describe the present state of the nouns they modify.'" *Morgan v. Healing Hands Home Health Care, LLC*, 57 Kan. App. 2d 368, 382, 453 P.3d 344, 354 (2019), *review denied* (Kan. Aug. 31, 2020) (quoting *Henson v. Santander Consumer USA, Inc.*, 582 U.S. ——, 137 S. Ct. 1718, 1722, 198 L. Ed. 2d 177 (2017)); *see also Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 452 (D.C. Cir. 2018), *judgment entered*, No. 15-1219, 2018 WL 4158384 (D.C. Cir. Aug. 21, 2018) (Henderson, J., concurring in part) (explaining that past participle may be used to denote present tense when combined with a present tense for the verb "to be," "(i.e., the pecans *are* covered in chocolate)"); P. Peters, *The Cambridge Guide to English Usage* 409 (2004) (explaining that the term "past participle" is a "misnomer[ ], since" it "can occur in what is technically a present . . . tense").

Our supreme court has cautioned that in the same way that we must guard against overlooking or ignoring words in a statute, "'we must be circumspect about adding words to a statute that the General Assembly did not place there.'" *In re Bentley D.*, 537 S.W.3d 907, 913 (Tenn. 2017) (quoting *Coleman v. State*, 341 S.W.3d 221, 241 (Tenn. 2011)). Moreover, we "'presume that each word used was purposely chosen by the legislature to convey a specific meaning.'" *State v. Marise*, 197 S.W.3d 762, 766 (Tenn. 2006) (internal quotation marks omitted) (quoting *State v. Denton,* 149 S.W.3d 1, 17 (Tenn. 2004)). Here, the Tennessee General Assembly was unmistakably clear in section 37-1-102(b)(1) that it intended its definition of abuse to apply to abusive conduct that occurred in the past, present, or immediate future. In contrast, our legislature did not choose to include clear language in section 37-1-102(b)(13)(C) that past (or future) educational neglect is

sufficient to deem a child currently dependent and neglected. Had the Tennessee General Assembly intended such a result, it could have easily used language similar to that employed in section 37-1-102(b)(1). And we presume that the legislature's choice to omit such verbiage from section 37-1-102(b)(13)(C) was intentional. *See **State v. Welch***, 595 S.W.3d 615, 623 (Tenn. 2020) (quoting ***State v. Loden***, 920 S.W.2d 261, 265 (Tenn. Crim. App. 1995)) ("The canon of statutory construction *expressio unius est exclusio alterius* provides that 'where the legislature includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that the legislature acted purposefully in the subject included or excluded.'"). Thus, the language utilized by the legislature, coupled with the de novo hearing procedure applicable in dependency and neglect actions, indicates that the educational neglect "must exist at the time of the *de novo* hearing." ***In re Caleb L.C.***, 362 S.W.3d at 599.

Turning to the facts presented at the de novo hearing, we must agree with Mother that DCS failed to submit clear and convincing evidence that the child was currently suffering from educational neglect. First, we note that the trial court's order does not indicate that it considered the child's present circumstances: "The court finds that the child is dependent and neglected pursuant to [section] 37-1-102(b)(13) by the lack of educational activities. The efforts by mother are substantially lacking and the court fully believes that the child has, in effect, been unlawfully kept out of school." Thus, it appears that the trial court focused on Mother's "educational efforts" that occurred at the time of the removal of the child, well before the de novo hearing.

To be sure, Mother was not responsible for the child's education at the time of the de novo hearing, as the child had been placed in DCS custody for nearly a year. Certainly, we understand the difficult situation that this creates, wherein a parent's poor choices are ameliorated by DCS's control over the situation. But we are constrained by the language of section 37-1-102(b)(13)(C) to apply its meaning as stated, for "it is not for the courts to alter or amend a statute." ***Gleaves v. Checker Cab Transit Corp.***, 15 S.W.3d 799, 803 (Tenn. 2000) (citing ***Town of Mount Carmel v. City of Kingsport***, 217 Tenn. 298, 306, 397 S.W.2d 379, 382 (Tenn. 1965)); *see also **BellSouth Telecommunications, Inc. v. Greer***, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)) ("When approaching statutory text, courts must also presume that the legislature says in a statute what it means and means in a statute what it says there.").

Still, our caselaw shows that even when a child is removed from the home, DCS may show current dependency and neglect by delving into the parent's mental state and current plans for the return of the child. *See, e.g.*, ***In re Crystal W.***, 2021 WL 214823, at *10 (concluding that dependency and neglect was shown when the parent had no concrete plans for the return of the child and was not taking her mental health issues seriously); ***In re Nehemiah H.***, 2020 WL 3885956, at *8 (concluding that dependency and neglect was shown when the parents failed to take responsibility for their neglect of the children and the children were still afraid of the parents). Evidence of this kind may demonstrate that

issues remain that put the child in danger of abuse or neglect, if not for the involvement of DCS in the child's life. But the evidence here did not show that Mother was presently intending to following the same course concerning the child's education as she had taken prior to the child's removal. Instead, Mother testified without dispute that should the child be returned to her care, she intends to enroll the child in the local public school. No evidence was presented that this plan was inappropriate, and the trial court made no finding that it did not believe Mother's testimony on this issue. Based on the foregoing, we conclude that DCS failed to meet its burden to demonstrate clear and convincing evidence of educational neglect as of the date of the de novo hearing in circuit court.

In sum, DCS failed to prove, by clear and convincing evidence, that the child was dependent and neglected either as the result of severe abuse or educational neglect. As such, the dependency and neglect petition must be dismissed. *In re Landon H.*, 2016 WL 762741, at *6 (citing *Green*, 2009 WL 348289, at *4). We therefore "remand the case for further proceedings in light of our holding." *In re K.A.P.*, 2013 WL 6665012, at *8. All other issues are pretermitted.

## V.    CONCLUSION

The judgment of the Marshall County Circuit Court is reversed, and this matter is remanded with directions to dismiss the dependency and neglect petition and for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellee the Department of Children's Services, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE